THE FULTON LIGHT, HEAT AND POWER COMPANY et al., Respondents, *v.* THE STATE OF NEW YORK, Appellant.

Riparian rights — ownership of the bed of streams, non-navigable in law — state has no title by virtue of its sovereignty in bed of Oswego river — description in grant of lands along river, by letters patent, held to convey lands to middle of stream — state may make improvements in channel of river for benefit of navigation, but cannot divert waters thereof without making compensation to riparian owner.

The common law fixed the title to the bed of tidal streams in the sovereign and to the bed of fresh-water streams in the owners of the adjacent banks, the owner of each side taking to the center, or *usque ad filum aquæ*, but made no distinction against the public right of passage and transportation.

There is to be considered, in applying the common law rule, the extent to which our fresh-water rivers and lakes form territorial boundaries and the nature of the title acquired under the laws of the state, to whose dominion England succeeded. In the former case, the rule was inapplicable and, in the other case, the part of the Hudson river above the ebb and flow of the tide and the Mohawk river, a fresh-water stream, in grants made to settlers under the Dutch government, were excepted and, upon the English succession, the beds of those waters, never having been conveyed, vested in the crown, as lands not theretofore granted. As to those rivers, the people of this state have ever asserted title, as to unappropriated lands. In other cases the common-law rule as to riparian ownership of the beds of fresh-water streams applies.

The common law rule governs with respect to the character of the Oswego river and being, within its definition, non-navigable in law, the state does not hold title to its bed by virtue of its sovereignty and can exercise no other right therein, save that of eminent domain, within constitutional limitations, except as such right relates to the improvement of the channel and bed of the river for the purposes of navigation and commerce, as one for the advantage of the public easement.

When it is not the channel or bed of the river which is to be regulated, and land is taken and the river waters are diverted for the purpose of constructing and operating some other channel distinct from that of the river, then the limit of the state's authority freely to intrude upon the riparian owner's rights has been reached.

The state granted by letters patent a tract "on the east side of the river below the Falls," by a description which ran from " a white ash sapling * * * standing on the east shore of the Oswego River " by courses to the east, to the north and to the west " to the said river and then up and along the same to the place of beginning." *Held,* that this grant should be construed as to its descriptive language as would be any ordinary grant of property, and the legal presumption is that it was intended to convey to the middle of such stream. Hence, the effect of the state's conveyance by its letters patent is that it granted a tract of land bounded westerly by the center of the Oswego river.

When, under the plea of the improvement of navigation, the property of the riparian owner is taken, or diminished by the diversion of the waters, for a public work not within, but wholly outside, the channel of the river, there is a clear case for the enforcement of the constitutional guaranty of compensation, and such owner has a proprietary interest in the water power of the river, which is incidental to the grant to its predecessors in title and which entitles it to compensation for the appropriation of that interest for the public use.

*Fulton Light, Heat & Power Co.* v. *State,* 138 App. Div. 931, affirmed.

(Argued December 14, 1910; decided January 17, 1911.)

Appeal from a judgment of the Appellate Division of the Supreme Court in the third judicial department, entered March 8, 1910, affirming a judgment in favor of plaintiffs entered upon an award of the Court of Claims.

The facts, so far as material, are stated in the opinion.

*Edward R. O'Malley, Attorney-General, Daniel E. Brong, Andrew E. Tuck* and *Arthur J. Hammond* for appellant. The Oswego river is a public navigable river and the question of the title to its bed is to be determined by the rules of law applicable to public navigable waters. (*People* v. *Vanderbilt*, 26 N. Y. 287; *Langdon* v. *Mayor, etc.*, 93 N. Y. 129; *R. I. Co.* v. *Shultz*, 116 N. Y. 382; *People* v. *Tibbetts*, 19 N. Y. 523; *People* v. *Canal Appraisers*, 33 N. Y. 461; *Sage* v. *Mayor, etc.*, 154 N. Y. 61; *Seneca Nation* v. *Christie*, 126 N. Y. 122; *Pierce* v. *Proprietors*, 10 R. I. 227; *State* v. *Buchanan*, 5 H. & J. [Md.] 317; *Barry* v. *Vil. of Port Jervis*, 64 App. Div. 268.) The interruption of water navigation by the rapids at Fulton does not affect the navigable character of the Oswego river. (*Canal Comrs.* v. *People*, 5 Wend. 423; *Canal Appraisers* v. *People*, 17 Wend. 571; *Matter of State Reservation*, 37 Hun, 537; *People* v. *Page*, 39 App. Div. 110; *The Montello*, 20 Wall. 30; *Morgan* v. *King*, 35 N. Y. 454; *Smith* v. *City of Rochester*, 92 N. Y. 463; *C. B. Co.* v. *Paige*, 83 N. Y. 178.) The state did not by the patent granted to Conrad Stene alienate any part of the bed of the Oswego river for the reason that the patent did not by express terms include land under the waters of the Oswego river. (*East Haven* v. *Hemingway*, 7 Conn. 186; *Town of Middletown* v. *Sage*, 8 Conn. 221; *Church* v. *Meeker*, 34 Conn. 421; *Commonwealth* v. *City of Roxbury*, 75 Mass. 451; *Canal Comrs.* v. *People*, 5 Wend. 423; *State* v. *Pacific Guano Co.*, 22 S. C. 50; *Rosborough* v. *Picton*, 12 Tex. Civ. App. 113, 116; *Sage* v. *Mayor, etc.*, 154 N. Y. 61; *Matter of Mayor of New York*, 182 N. Y. 361, 365; *Royal Fishery of the Banne*, Davies' Rep. 149; *Attorney-General* v. *Farmen*, 2

Levinz, 171.)   The title of the state to lands under public navigable waters, whether fresh or salt, is engrafted with a trust for the benefit of the public and is inalienable except for certain public uses.   (*I. C. R. R. Co.* v. *Illinois*, 146 U. S. 387 ; *Martin* v. *Waddell*, 16 Pet. 367 ; *Coxe* v. *State of N. Y.*, 144 N. Y. 396 ; *Mayor* v. *Hart*, 95 N. Y. 443 ; *Town of Brookhaven* v. *Smith*, 188 N. Y. 74 ; *Shively* v. *Bowlby*, 152 U. S. 1 ; *Saunders* v. *N. Y. C. & H. R. R. R. Co.*, 144 N. Y. 75 ; *Bristow* v. *Cormican*, L. R. [3 App. Cas.] 641.)   If there is any ambiguity in the language of the Stene patent, the contention most favorable to the state must be adopted.   (*Trustees of East Hampton* v. *Vail*, 151 N. Y. 463 ; *De Lancey* v. *Pipegras*, 138 N. Y. 26 ; *People* v. *Broadway R. R. Co.*, 126 N. Y. 29, 36, 37 ; *Dermott* v. *State*, 99 N. Y. 101, 109 ; *Morris* v. *U. S.*, 174 U. S. 196 ; *Gere* v. *McChesney*, 84 App. Div. 39 ; *L. B. P. O. Co.* v. *Briggs*, 198 N. Y. 287.)   Assuming for the purpose of argument that the Oswego river is not a public navigable river within the foregoing rules relating to the title to the bed, the state, nevertheless, is entitled to use the bed and waters of the river for the improvement of navigation, without compensation, by virtue of its paramount right to control navigation.   (*People* v. *Platt*, 17 Johns. 196 ; *Morgan* v. *King*, 35 N. Y. 454 ; *Matter of Comrs. of State Reservation*, 37 Hun, 537 ; *Smith* v. *City of Rochester*, 92 N. Y. 463 ; *Shively* v. *Bowlby*, 152 U. S. 1 ; *Slingerland* v. *I. C. Co.*, 169 N. Y. 60 ; *L. B. P. O. Co.* v. *Briggs*, 198 N. Y. 287 ; *W. C. R. R. Co.* v. *Chicago*, 201 U. S. 506, 520 ; *Gibson* v. *United States*, 166 U. S. 269 ; *C., B. & Q. Ry. Co.* v. *Drainage Comrs.*, 200 U. S. 561 ; *Scranton* v. *Wheeler*, 179 U. S. 141 ; *Union Bridge Co.* v. *United States*, 204 U. S. 364.)   Assuming for the purpose of argument that the bed of the Oswego river was alienated by the Stene patent, it was reacquired by the state as canal lands at the time of the construction of the Oswego canal in 1826, and at that time the state acquired all the water power of the Oswego river at the point at which claimants' property is located.   (*Rexford* v. *Knight*,

15 Barb. 627; 11 N. Y. 308; *Higgins* v. *Reynolds*, 31 N. Y. 151; *Carpenter* v. *City of Cohoes*, 81 N. Y. 21; *Matter of State Reservation*, 16 Abb. [N. C.] 159; *Alsheimer* v. *Boon*, 31 Misc. Rep. 333; *C. I. Co.* v. *Mayor, etc.*, 166 N. Y. 92; *Gaw* v. *State*, 127 N. Y. 190; *Marks* v. *State*, 97 N. Y. 572.) No interest in or title to canal lands or waters can be acquired by prescription or adverse possession. (*Burbank* v. *Fay*, 65 N. Y. 57; *W. W. Mills* v. *Shanahan*, 128 N. Y. 345.)

*Charles A. Collin, John L. Wells, William D. Gaillard, George Coffing Warner* and *Hugo Hirsh* for respondents. The Oswego river is non-navigable in law, and the Court of Claims committed no error in construing the Stene patent of 1793 in accordance with the established common-law doctrine of this state for construing deeds of lands bordering on streams non-navigable in law. (*Morgan* v. *King*, 35 N. Y. 457; *Varig* v. *Smith*, 5 Paige, 137; 9 Paige, 547; *Van Buren* v. *Baker*, 12 N. Y. S. R. 209; *Matter of State Reservation*, 37 Hun, 546; *Smith* v. *Bartlett*, 180 N. Y. 360; *Hooker* v. *Cumming*, 20 Johns. 99; *People* v. *Platt*, 17 Johns. 210; *Comrs.* v. *Kempshall*, 26 Wend. 413; *Ex parte Jennings*, 6 Cow. 518; *Starr* v. *Child*, 20 Wend. 149.) The patent from the state to Conrad Stene, constituting the first deed in the chain of title from the state to Hubbard and Falley was executed and delivered by the state for a valuable consideration and not as a gratuity, and is, therefore, to be construed in accordance with the rules governing like business transactions between private persons, and is not to be construed strictly in favor of the state. (*Langdon* v. *Mayor, etc.*, 93 N. Y. 129; *Mayor, etc., of N. Y.* v. *Starin*, 106 N. Y. 19; *Mayor, etc., of N. Y.* v. *M. R. Co.*, 143 N. Y. 1; *Varick* v. *Smith*, 9 Paige, 547; *Van Buren* v. *Baker*, 12 N. Y. S. R. 211; *Gere* v. *McChesney*, 84 App. Div. 40; *L. B. P. O. Co.* v. *Briggs*, 198 N. Y. 287.) A deed by a private person of lands bordering on an interior fresh-water non-tidal stream forming no part of the state boundary and non-navigable in law is presumed to convey the fee of the land to the center of the

stream, and " where there is ambiguity with reference to the description or to the commencing point or where there is doubt with reference to the intent of the grantor the presumption that the fee was intended to pass will prevail." (*Van Winkle* v. *Van Winkle*, 184 N. Y. 193; *Mott* v. *Mott*, 68 N. Y. 246; *Wilcox* v. *Bread*, 92 Hun, 9.) The presumption of conveyance to the center of a non-navigable stream is stronger than the presumption of conveyance to the center of a highway. (*Gouverneur* v. *Nat. Ice Co.*, 134 N. Y. 355; *Luce* v. *Carley*, 24 Wend. 451; *Van Winkle* v. *Van Winkle*, 184 N. Y. 203; *Sizer* v. *Devereux*, 16 Barb. 166; *Herring* v. *Fisher*, 1 Sandf. 344; *Pell* v. *Pell*, 65 App. Div. 388; *Varick* v. *Smith*, 5 Paige, 137; *Van Buren* v. *Baker*, 12 N. Y. S. R. 209; *Seneca Nation* v. *Knight*, 23 N. Y. 498; *H. R. Tel. Co.* v. *Forrestal*, 56 Misc. Rep. 133.) The courts below properly held that by the transactions between the state and Hubbard and Falley, during the years 1825, 1826 and 1827, in connection with the construction of state dam No. 4 and the old Oswego canal, the state acquired the right to maintain and operate the dam, canal and connections, and to divert from the pool above the dam so much water, and only so much water, as from time to time should be necessary to operate the Oswego canal; and that the riparian rights of Hubbard and Falley, on the completion of such transactions, in 1828, included their right to draw from the dam, from time to time, under proper regulations and restrictions, all of the waters of the easterly half of the river which the state should not need to divert for the navigation of the Oswego canal. (*Varick* v. *Smith*, 9 Paige, 559; 5 Paige, 146; *Wright* v. *Shanahan*, 61 Hun, 264; 149 N. Y. 495; *People* v. *Common Council*, 128 App. Div. 49; *Bell Telephone Co.* v. *Parker*, 187 N. Y. 305.) The public highway easement for purposes of navigation and commerce, to which all rivers navigable in fact are subject, does not embrace the diversion into artificial channels of the waters of such streams. Such diversion may be effected only through the exercise of the right of eminent domain, with full compensation to the owners

of the riparian rights damaged thereby. In streams not navigable in fact, there is no public highway easement, and they cannot be made navigable in fact without the consent of the riparian owners except through the exercise of the right of eminent domain. (*Hayden* v. *State*, 132 N. Y. 533 ; *Waller* v. *State*, 144 N. Y. 597 ; *L. P. Co.* v. *State*, 15 App. Div. 169 ; *Comrs.* v. *Kempshall*, 26 Wend. 404 ; *People ex rel. Loomis* v. *Canal Appraisers*, 33 N. Y. 461 ; *Canal Comrs.* v. *People*, 5 Wend. 423 ; *Ex parte Jennings*, 6 Cow. 518 ; *Smith* v. *City of Rochester*, 92 N. Y. 485 ; *Sweet* v. *City of Syracuse*, 129 N. Y. 336.) The claimants have acquired through prescription and adverse possession, arising from long-continued user, title to the lands under water adjacent to their uplands and riparian rights, including the right to the use of all waters not actually used by the state for the old Oswego canal. (*Matter of Comrs. of Niagara Reservation*, 37 Hun, 537 ; *Comrs.* v. *Kempshall*, 26 Wend. 404 ; *Timpson* v. *Mayor, etc.*, 5 App. Div. 429 ; *Belknap* v. *Trimble*, 3 Paige, 605 ; *People* v. *Mould*, 37 App. Div. 35 ; *Hammerschlag* v. *Duryea*, 58 App. Div. 288 ; *Trustees of Brookhaven* v. *Strong*, 60 N. Y. 56 ; *Iselin* v. *Vil. of Cold Spring*, 120 App. Div. 577 ; *Sherman* v. *Kane*, 86 N. Y. 72 ; *Katz* v. *Kaiser*, 154 N. Y. 298 ; *Bell* v. *Hayes*, 60 App. Div. 386 ; *French* v. *Carhart*, 1 N. Y. 102.)

GRAY, J. The respondent company, as its name indicates, is a corporation, engaged in the business of manufacturing and supplying gas, electricity and steam, for producing light, heat and power, to the city of Fulton and to other cities, towns and villages. Its power plant and other properties, as affected by this litigation, are situated at the city of Fulton, on the easterly side of the Oswego river. Under the provisions of chapter 147 of the Laws of 1903, generally known as the Barge Canal Act, the state had appropriated certain of the land properties and riparian rights of the claimants and this claim was filed and prosecuted in the Court of Claims, as provided for by the act, to recover compensation therefor. The claimants recovered a judgment against the state for sums

of money " for the permanent appropriation " of certain described parcels and, as to two of them, for their right, title and interest in the land in the bed of the river and as riparian owners.   The judgment has been unanimously affirmed at the Appellate Division and, thus, all questions of fact have been conclusively established ; leaving, however, for our consideration legal questions of some importance to the state, in the execution of the great work undertaken.   They arise upon the defenses interposed by the state to the claim of the respondents.

The state disputes its liability upon the. grounds, in substance, that the Oswego river is a navigable river, the ownership of the bed of which is by law in the state; that, the land affected being in the bed of the river, the claimants never acquired title to it by grant, or otherwise, and, upon the assumption that the title is in them, the work undertaken being for the improvement of navigation, that the state can use the bed and waters of the river without coming under any liability to make compensation to those persons, whose properties may be taken or interfered with.

The Oswego river is a fresh-water stream, of some twenty-five miles in length, flowing in a northerly direction, through the city of Fulton, into Lake Ontario.   At the part where the claimant's properties are situated, the river is not navigable for some distance to the north and the south ; but, above and below, it has been used for purposes of navigation and commerce.   Its navigability is not, in any wise, affected by any of the claimant's structures.   In 1793 the state granted to Conrad Stene, by letters patent, a tract, containing 200 acres of land ; which, it is claimed, comprehends within the description of the grant the premises to which the claimants assert title and rights.   By mesne conveyances, what title Stene had to them has passed to these claimants and, although their properties are on the east side, and within the margin, of the river, they have not, since 1793, constituted any part of the bed of the natural channel.   Prior to 1819, the then owners of the premises, Hubbard and Falley, had, at a short

distance southerly from the present power plant, constructed a wing dam, extending into the river, and a sawmill, which was operated thereafter by water supplied from the dam through a flume upon their lands.   In 1827, pursuant to the authority of acts of the legislature, the canal commissioners of the state, for the purpose of improving the navigation of the river by the construction of the Oswego canal, had erected a dam across the river.   This canal followed the river; using its actually navigable portions and, where not navigable, passing around the dams built for its facilitation.   The dam pier and the portion of the dam wall between the pier and the center of the river took the place of the former wing dam and were, in part, upon the power plant property.   They remained as constructed until 1857, when, the pier and easterly end of the dam having been carried away by a flood, the entire dam and dam pier were rebuilt of stone by the state, in substantially the same location.   As originally constructed by the commissioners and as reconstructed, down to the time of the present appropriation by the state, the state dam had one, or more, openings in the dam pier along the southerly side of the sawmill, for the purpose of supplying water power to it and to the various plants, which have been put up on its site and elsewhere upon the property.   The southerly walls of the sawmill and of the buildings which have replaced it, rested upon the northerly portion of the original, and of the reconstructed, dam piers.   Around the easterly end of this dam, which reached from bank to bank of the Oswego river, the Oswego canal was built and, thereafter, so much of the river water was diverted into it as was needed for its operation; but no water power was cut off, nor otherwise affected. No payment appears ever to have been claimed, or offered, for any damages to the power plant property.   It is to be presumed, and the facts warrant the presumption, that the owners regarded themselves as not, appreciably, injured by what was done at the time, as, also, by reason of the provision made for their case by the legislature in an act passed in 1823, (Laws 1823, chap. 112).   It was enacted " for the relief

of the owners of hydraulic privileges, where dams are erected by Canal Commissioners," and, while providing that such owners shall be entitled to the use of so much of the surplus water as may be necessary for their mills, upon their constructing a raceway and gate in the dam, further, provided that nothing therein contained should be so construed as to deprive them " of any right or rights, which they may have owned and possessed prior to, and independent of, any license, or grant, made by this act, unless compensation shall be made therefor," etc. The owners of the mill plant, in 1827, executed a bond to the state, as required by the act where mill owners avail themselves of the right to construct a raceway and a gate, conditioned to keep them in constant repair; but, of course, that could not affect any rights which they may have possessed. They were expressly saved by the act. As already observed, no claim was ever made against the state for any of the acts of the canal commissioners in constructing the Oswego canal and matters remained as they were in the time of Hubbard and Falley's ownership; excepting that changes were made to the old flume and a new hydraulic canal was built. The claimants hold the parcels of property and the riparian rights, affected by the appropriation of the state under the provisions of the Barge Canal Act, with the same right, title and interest, as did Hubbard and Falley; who, first, commenced to subdivide the tract of 200 acres by various grants. The state had not, heretofore, sought to acquire any further rights, or properties, than were involved in the construction of the Oswego canal, in 1827, on the easterly margin of the river, and in the diversion thereto of so much of the river waters as was necessary. The claimants and their predecessors in interest appear to have utilized and enjoyed, without claim, or interference, on the part of the state, such properties and rights as had become vested in Conrad Stone and his grantees. The riparian rights of the claimants attached to the three parcels involved here and consisted in the right to use the river waters; the most beneficial right, naturally, being the use at the power-plant structure of

the opening in the dam. It is found that ever since 1827, until the present appropriation by the state, the claimants and their predecessors in title have been "in the actual, undisputed and open possession, claiming under and by virtue of written instruments, title, ownership and rights of possession," of the properties in question and have drawn from the river, through the openings in the dam pier, so much of the water as has been needed for their purposes. The possession and occupation for upwards of sixty years, prior to the filing and service of the appropriation maps, are found to have been " adverse to any claim by the State to any part thereof, except as to the construction and maintenance of the said State dam and the use of the waters of the Oswego River by the State."

In this situation, in 1906, the state engineer took the requisite action under the provisions of the Barge Canal Act to appropriate the lands, structures and waters of the claimants, in question. By the terms of that act it was, among other things, provided that that official should be authorized to " enter upon, take possession of and use lands, structures and waters, the appropriation of which for the use of the improved canals and for the purposes of the work and improvement authorized by this act, shall in his judgment be necessary." (L. 1906, ch. 365, section 1.) The state engineer was to make and file maps of the lands to be appropriated and the superintendent of public works was to serve upon the owner of any real property, so appropriated, notices of the filing and date of filing of such maps, which should, specifically, describe the portions appropriated. The act provides that, from the time of the service of such notice, the entry upon, and the appropriation by the state of, the real property therein described should be deemed complete ; that such notices should be conclusive evidence of such entry and appropriation, and of the quantities and boundaries of lands appropriated, and that the Court of Claims should have jurisdiction to determine the amount of compensation for lands, structures and waters so appropriated, or damages caused by the work of improvement.

The state engineer made, and duly filed, maps specifically describing the three parcels involved here and the water rights of two of them, and the superintendent of public works duly served upon the claimants the notices, as required by the act; which, also, took, with respect to the two parcels, all the claimants' " right, title and interest as riparian owners."

There is no serious dispute with respect to what the state has appropriated of the claimants' lands and water rights, and the question is whether, upon the facts, the claimants were invested with that lawful ownership of these lands and waters within the banks of the Oswego river, which would support their judgment for compensation.   It must, finally, be noted as a material fact, that the proposed barge canal, where it crosses the claimants' property, is wholly outside the channel of the Oswego river, as it existed at the time of the service of the notices of appropriation and as it was at the time of the grant by the state to Stene in 1793.

This, perhaps somewhat extended, review of the facts is in order to make intelligible the situation of the parties. Whether the ownership of the bed of the Oswego river was, or was not, in law, in the state and whether, or not, its grant to Stene conveyed to him the land in the bed to the center of the stream, the claimants stand in the shoes of the owners of the tract of 200 acres, as they were in 1819, under the title derived from Stene; except so far as the state has exercised its paramount, or sovereign, right to improve the navigation of the river by the construction of the old Oswego canal and of the dam and other works incidental thereto.   So far as it appears, the state had at no time sought to appropriate, *in invitum,* any rights of the claimants' predecessors in title, whatever they were ; but, rather, had, from the time of the enactment of statutes bearing upon the construction of the Oswego canal to the enactment of the present Barge Canal Act, reserved, if it had not recognized, those rights.   It may be added that the situation presents facts and circumstances, which would support the claimants' record title and rights by adverse possession and by prescription.

It is argued in behalf of the state that the Oswego river is a public navigable river and that, under the rule of the common law, it was vested with the ownership of its bed. The fact is that this river is not navigable for any purpose at the city of Fulton, for some distance north and south; although in other portions it is used for navigation and commerce. But were it altogether navigable in its course, the question of its ownership would be settled by the common-law rule relating to the title to beds of non-tidal, or fresh water, streams. In law, the term "navigable river" has received a technical application to rivers, or arms of the sea, in which the tide ebbs and flows. The common law of England regarded all fresh water rivers as non-navigable. Under its rule the title to the soil of the sea, or of the arms of the sea, or of tidal rivers, was in the crown, subject to an easement in favor of the public for passage, or transportation; while fresh water rivers belonged to the owners of their banks, also, subject to the use of the public as navigable highways. This public right was not affected by the situation of the title, whether in the crown, or in the riparian owner. Whether salt, or fresh, water streams, if they were large enough to be capable of common passage and thus, in fact, were navigable, they were regarded as common highways, which might not be impeded. (See Lord Hale's Tract de Jure Maris; *Ex parte Jennings*, 6 Cow. 518; *Morgan* v. *King*, 35 N. Y. 454.) The common law of England fixed, as an unalterable rule, the title to the bed of tidal streams in the sovereign and to the bed of fresh water streams in the owners of the adjacent banks, the owner of each side taking to the center, or *usque ad filum aquæ;* but made no distinction against the public right of passage and transportation. The navigability, in fact, of the stream had no relevancy to the question of the title to its bed; it was relevant solely to the public right to pass, or to transport, upon it, as upon a highway. A stream, to be exclusively owned by the riparian owner, must be too small to be navigable, in fact. In adopting the common law of England, the people of this state took over

such of its rules as were applicable to, and consistent with, their condition and circumstances.   It became, and is, the law of the state and the basis of its jurisprudence, except so far as its principles and rules of action have been modified by Constitution, statutes, or usages ; or were inapplicable to our situation.   Its rules upon the subject of the rights of riparian owners, necessarily, applied but imperfectly to the situation of our country, with its many large navigable bodies of water in bays, rivers and great inland lakes.   We have but to contrast the situation of Great Britain, an island, with short rivers, navigable, ordinarily, only so far as the tide ebbed and flowed, to perceive the extent to which modifications of those rules became essential.   In our state, there were to be considered, in applying the common-law rule, the extent to which our fresh-water rivers and lakes formed territorial boundaries and the nature of the title acquired under the laws of the state, to whose dominion England had succeeded. In the former case, the rule was, clearly, inapplicable and, in the other case, as I understand the result of the decisions, two of our rivers formed exceptions to the general rule.   The part of the Hudson river above the ebb and flow of the tide and the Mohawk river, a fresh-water stream, in grants made to settlers under the Dutch government, were excepted and, upon the English succession, the beds of those waters, never having been conveyed, vested in the crown, as lands not theretofore granted.   As to those rivers, the people of this state have ever asserted title, as to unappropriated lands.   (See *Canal Appraisers* v. *People*, 17 Wend. 571 ; *Commissioners of Canal Fund* v. *Kempshall*, 26 ib. 404 ; *Smith* v. *City of Rochester*, 92 N. Y. 463.)   The case of *People* v. *Tibbetts*, (19 N. Y. 523), involved the rights of riparian owners on the Hudson river and cannot be regarded as supporting the appellant's position.   (*Smith* v. *City of Rochester, supra.*) Chancellor Walworth, in *Child* v. *Starr*, (4 Hill at p. 372), speaks of the case of *Commissioners of Canal Fund* v. *Kempshall, (supra)*, as removing any doubt upon the question of whether the common-law rule prevailed here in the

construction of conveyances of lands bounded by, or upon, a fresh-water, or non-tidal, stream. In *Smith* v. *City of Rochester*, (*supra*), it was, distinctly, so held. In *Chenango Bridge Co.* v. *Paige*, (83 N. Y. 178), which involved the riparian rights of owners upon the Chenango river, a fresh-water stream, it was held that, though navigable as a highway, it was a private river; that they owned the bed and banks, subject to the public easement of navigation, and that the legislature, except under the power of eminent domain, upon making compensation, could not interfere further than for the purpose of regulating, preserving and protecting the public easement. I know of no exceptions in this state to the common-law rule of riparian ownership of the beds of fresh-water streams, where not constituting boundary lines, other than the two rivers referred to. If not affected by situation, or by derived title, there is no good reason why the common-law rule should not obtain with respect to our fresh-water rivers, To meet differing political institutions and usages, it has been somewhat enlarged, or extended, with respect to the riparian owner's right of access and of use on tide waters. (*Rumsey* v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 79; *Trustees, etc., Town of Brookhaven* v. *Smith*, 188 ib. 74.) The Oswego river, however it is to be regarded as a highway for navigation and commerce, is not taken out of the common-law rule by any fact, or feature, and two decisions by the courts of this state have determined its character of non-navigability in law, at an early day. I do not think that their authority has been shaken by the principle of any subsequent decision of this court upon the applicability of the common-law doctrine of riparian rights. The first of the cases, I allude to, is that of *Varick* v. *Smith*, (5 Paige Ch. 137; 9 ib. 547). Varick and Smith were owners of lands and mills on opposite sides of the Oswego river, a short distance below one of the dams built in connection with the old Oswego canal. The state had leased to Smith, in 1827, the waters of the river not needed for the canal and he claimed the right thereunder to divert the waters to his mill on the east side of the river, to such extent as to prevent

them from supplying Varick's mill on the west side.  Varick, claiming under state patents, to own in fee to the center of the Oswego river, with the riparian right to have one-half of the surplus water, not needed for the canal, flow upon his lands, brought suit against Smith and the attorney-general to have the lease annulled and an injunction restraining the diversion of the water involved.  Varick succeeded in establishing his claim and his rights predicated thereon.  In the various opinions rendered in the course of the litigation by the vice-chancellor and by Chancellor WALWORTH, in affirmance, it was held, at all times, that the Oswego river was subject to the common-law right of riparian ownership to the center, which was subordinate, only, to the servitude of the public, for the purposes of navigation and commerce, and to the governmental right of eminent domain.  Its navigability in fact did not affect its non-navigability in law, as a fresh-water stream, and the common-law character of its riparian ownership was, consequently, unaffected.  Vice-Chancellor GRIDLEY, in determining the issues upon the trial, refers to Lord HALE's statement that fresh rivers belong to the owner of the soil adjacent and to his definition of navigable, or public, rivers, in the absolute sense of the term, as being only such, which are arms of the sea, where the sea flows and reflows, and holds that this doctrine of the common law is controlling; that it " is still the law of the land." *Van Buren* v. *Baker*, (12 N. Y. St. Rep. 209), is the second of the early Oswego river cases and involved a claim of the plaintiff to the title to an island in the river, under a conveyance from the state of a tract of land on the easterly side of the river.  In sustaining a judgment in the plaintiff's favor, the General Term, (in 1887), followed the authority of *Varick* v. *Smith* (*supra*).

Upon the question thus far discussed, I conclude that the common-law rule governs with respect to the character of the Oswego river and being, within its definition, non-navigable in law, the state would not hold title to its bed by virtue of its sovereignty and could exercise no other right therein, save

that of eminent domain, within constitutional limitations; except as such right might relate to the improvement of the channel and bed of the river for the purposes of navigation and commerce, as one for the advantage of the public easement. We are not called upon to give, or to search for, a reason for a rule, which, by long standing, has acquired the stability of a rule of property; it is sufficient that a rule exists, by which the property rights of persons have been deemed to be measured and fixed. If there was any reason for the abandonment of this rule of the common law, the courts of the land, presumably, would have acted upon it; but it has remained, with, only, such modifications as to accord with the the requirements of a new geographical situation and with differing political conditions.

It is objected in behalf of the state, the premises affected being in the bed of the Oswego river, that the grant by letters patent to Stene did not convey to him any part of the bed. As the people of this state became the owners of the unsettled lands upon the river, in right of the succession of the state to their dominion, they were capable of being granted by the legislature under letters patent. Those by which Stene took, in 1793, granted a tract of 200 acres "on the east side of the river below the Falls," by a description, which ran from "a white ash sapling * * * standing on the east shore of the Oswego River" by courses to the east, to the north and to the west "to the said river and then up and along the same to the place of beginning." This grant should be construed as to its descriptive language, as would be any ordinary grant of property. Being presumed to have been made for a sufficient consideration, there is no reason for construing it with any extraordinary strictness as against the grantee. It is not like a legislative grant of some exclusive franchise, or privileges, where the rule of a favorable construction to the state will be rigidly applied. As a boundary of the grant is on a fresh-water river, the location of the monument for the starting point in the sapling is not a delimitation of the westerly boundary

line. As the monument could not conveniently, or properly, be placed in the channel of the river, in placing it on the bank it merely fixed a point in the south line; to which line the course from the northerly boundary returned along the river. Such a monument indicates the place of the line, or of its intersection with the stream, and not the end of it. (*Luce* v. *Carley*, 24 Wend. 451; *Van Winkle* v. *Van Winkle*, 184 N. Y. 193, 204.) It is an old and well-settled rule where the grant has no other boundary on the river side but the stream itself, that the legal presumption is that it was intended to convey to the middle of such stream. A boundary line, which is described as " along the shore," or " along the bank," of a fresh-water stream would not extend the grant to the center; for there would be a prescribed limitation of the line to the shore, or bank. But where, as here, the line, when it reaches the river, is then described as running " along the same," it will be construed as following the thread of the stream. A boundary by, or along, a watercourse is effectual to take the grant, by legal construction, to its center and running the line to a monument standing on the shore does not restrict the grant; for it is only referred to as giving the directions of the lines, and not as restricting the boundary. (*Child* v. *Starr*, 4 Hill, 369, 375 ; *Luce* v. *Carley*, 24 Wend. 451 ; *Seneca Nation of Indians*, v. *Knight*, 23 N. Y. 498 ; *Smith* v. *City of Rochester*, 92 ib. 463 ; *Gouverneur* v. *Nat'l Ice Co.*, 134 ib. 355.) I conclude, therefore, upon the question of the effect of the state's conveyance to Stene by its letters patent, that it granted to him a tract of land bounded westerly by the center of the Oswego river.

It is, further, objected on behalf of the state that if the Oswego river is not in law a public navigable river, within the common-law rule, the state is, nevertheless, " entitled to make use of its bed and waters for the improvement of navigation, without compensation." The argument is that the proposed construction of the barge canal is such an improvement and falls within the rule, which authorizes the state authorities, in such cases, to control and regulate the river.

27

The right of the state to make improvements in the river for the benefit of the public, in facilitating navigation and transportation thereon, must be fully conceded. It may do so without regard to the private ownership of the bed of the river. The proprietary interest of the riparian owner is subordinate to the public easement of passage and the state may be regarded as the trustee of a special public servitude ; as it was termed in *Commissioners of Canal Fund* v. *Kempshall,* (26 Wend. 404). In the exercise of its authority, in that respect, the legislature may direct the performance of acts by state officers, which tend to promote the public right of passage and transportation, without subjecting the state to liability. When, however, it is not the channel, or bed, of the river, which is to be regulated, and land is taken and the river waters are diverted for the purpose of constructing and operating some other channel distinct from that of the river, then the limit of the state's authority freely to intrude upon the riparian owner's rights has been reached. (*Commissioners of Canal Fund* v. *Kempshall,* 26 Wend. 404 ; *Smith* v. *City of Rochester,* 92 N. Y. 463, 484.) In *Kempshall's* case, his mill race on the Genesee river was obstructed for the purpose of constructing a state aqueduct for canal purposes, and to his claim for damages, (as riparian owner to the center of the river), the state opposed its absolute right to divert the river water for such purposes. · The state was held to be liable for damages in diverting the water from the mill. The chancellor observed that "the only restriction upon his, (Kempshall's), right to use the bed of the river absolutely as his own, was the right of the public to navigate the stream." (p. 413.) It was said, in the same case, by Senator Verplanck : " I cannot assent to the position that the conceded common-law authority of the state over such rivers, for the purposes of navigation, comprehends the right to divert the waters to other purposes of artificial navigation wholly distinct from that of the river itself." (p. 421.) This language was quoted in the opinion of this court in *Smith* v. *City of Rochester,* (*supra*), as was, also, the further remark of the senator, that,

" by its, (the state's), sovereign right of eminent domain, it undoubtedly may do so, * * * but all these exercises of sovereign authority are, alike, ' the taking of private property for public use,' which the Constitution pronounces may not be done, ' without just compensation.' "    (p. 422.)

It is found, in this case, that " the proposed Barge Canal, where it crosses the property of the claimant, is wholly outside the channel of the Oswego river, as it existed  *  *  * in 1906 and as it was at the time of the grant by the state in 1793." It is, also, found that the land occupied by the claimants' properties " have not since 1793 constituted a part of the natural channel, or bed, of the Oswego River." When in 1906, under the provisions of the Barge Canal Act of 1903, the state authorities made the appropriations described in the notices, the claimants were deprived of the use of the water through the opening of the dam pier, over and around which the power plant structure had been built, and there were taken from them distinct parcels of land and the appurtenant riparian rights. It is difficult, if at all possible, to perceive how all this could be done for this new artificial waterway upon the bank of the river, without liability for damages; any more than it was possible in the case of the aqueduct for state canal purposes in *Kempshall's Case* (*supra*). The claimants had a proprietary interest in the water power of the Oswego river, which was incidental to the grant to their predecessors in title and which entitled them to compensation for the appropriation of that interest for the public use. That a stream, adequate in size for public transportation, or passage, should be subjected to a control, or a regulation, confined to such purposes, suggests no legal injury to riparian ownership. But when, under the plea of the improvement of navigation, the property of the riparian owner is taken, or diminished by the diversion of the waters, for a public work not within, but wholly outside, the channel of the river, I think there is a clear case for the enforcement of the constitutional guaranty of compensation. If the appropriation is for a purpose not incidental to the natural, or public, servitude

in the river, how could that provision of the fundamental law of this government — so instinct with the principle of justice — find juster application? The state, by the exercise of its power of eminent domain, could take these claimants' lands and divert from their power plant properties the water power, which operated them, upon making just compensation therefor; but, in my opinion, it had no unlimited right to make a use of the river for a public purpose, except as such purpose was related to the improvement of the channel, or bed, of the river itself for purposes of navigation or transportation.

Possibly, the question of title and right by adverse possession and prescription does not become important, in view of the conclusions already stated. As the point is made that the state re-acquired the bed of the Oswego river "as canal lands at the time of the construction of the Oswego Canal in 1826" and, at that time, acquired all the water power, it may be useful to discuss this question. I think that, on the facts, the record title of the claimants to the land in question, by long-continued possession and occupation, and their right, by prescription, to use the waters not actually needed for the old Oswego canal, are re-inforced and made good. Such possession and right were not inconsistent with the public right of easement. It is found that such possession and occupation, by them and by their predecessors in interest, of the properties described and the use by them of the water for supplying water power, "for upwards of sixty years prior to the filing and service of the appropriation maps, have been under claim of title founded upon written instruments and open, notorious and adverse to any claim of the state, or any one else, to any part thereof, except as to the construction of the state dam and the use of the waters of the Oswego river by the state, as aforesaid, (*i. e.*, for the old Oswego canal). No cause of action for the recovery of the possession of any part * * * has accrued to the state within forty years prior to the service and filing of said appropriation maps; nor has the state, nor any one from whom it claims, received rents and profits within said period from said three properties, or any part of

either thereof." As between individuals, under such circumstances, the period of twenty years is prescribed by the Code of Civil Procedure as constituting an adverse possession, (Section 369). By section 362 of the Code, it is provided that the People will not sue with respect to real property, " by reason of the right or title of the People to the same, unless either, (1), the cause of action accrued within forty years before the action is commenced; or, (2), the People, or those from whom they claim, have received the rents and profits of the real property, or of some part thereof, within the same period of time." No lapse of time will furnish a defense to an encroachment on a public right, (*Burbank* v. *Fay*, 65 N. Y. 57; a case where the plaintiff claimed rights to the continued use of the water of a part of the Erie canal); but that a right to the enjoyment of an easement may be gained by prescription against the state was held at an early day. In the case of *Commissioners of Canal Fund* v. *Kempshall*, already alluded to, (*ubi supra*), where rights in the Genesee river were involved, it was said by Senator Verplanck, (p. 421), " The paper title made out is supported and attested by such a continued occupation of the bank and the use of the water for thirty-five years, under claim of title to the whole, as would alone establish an adverse possession conclusive against any private claim. * * * The long adverse possession is alone sufficient to give an indisputable title against all private claimants, since it exceeds the twenty years' statutory limitation of private suits. But the state itself, if it were not concluded by its own grant, cannot sue for these lands under water or their issues or profits, unless the right or title had accrued within forty years, (according to the Act of 1804 * * *), or unless the People have received the rents and profits within that term. As neither of these facts can be maintained here, then it follows according to the same statute, that ' the persons holding such lands shall freely hold and enjoy the same against the said People and all persons claiming under them.' "

In another case, it was held, with respect to the right of riparian owners, as against the state, to maintain a wing dam

in the Niagara river, that a claim for compensation for the value of its use might be lawful, if it had "the support of a prescriptive right to maintain it." (*Matter of Commissioners of State Reservation, etc.*, 37 Hun, 537; and see *Timpson* v. *Mayor, etc., of N. Y.*, 5 App. Div. at p. 429.) In *Burbank* v. *Fay*, (*supra*), the elements necessary to constitute a prescriptive right were considered and it was said that "the possession should have certain qualities and characteristics, such as being adverse, continuous, uninterrupted, and by the acquiescence of the owner of the estate over which the easement is claimed. An adverse possession under this rule means a claim asserted as a matter of right, and cannot grow out of a mere permissive enjoyment." (p. 65.) In that case, the claim was, in effect, against the state, whose commissioners' acts, in depriving the plaintiff of certain privileges, were the subjects of complaint, and the rule was deemed applicable to the case; inasmuch as the possession did not comply with it. There was no proof how the privileges connected with the use of the Erie canal basin commenced and, therefore, it was necessary to presume, as the only *lawful* manner was by permission of the state authorities, that it commenced in that manner.

Therefore, I think that the title of these claimants is as well supported by the adverse character of the possession of the premises, as by the record title.

At some length — quite sufficient I think for the purpose — I have discussed the important questions presented upon this appeal. For an ampler discussion of the questions of fact and of law, a reference to the opinions of the Court of Claims may, most profitably, be made. Judge Rodenbeck, who spoke for that court, has treated them with great thoroughness and ability.

Upon the question of title by adverse possession, or prescription, which has been discussed, I am authorized to say that Chief Judge Cullen is of the opinion, on the authority of *Burbank* v. *Fay*, (65 N. Y. 57); *Donahue* v. *State of N. Y.*, (112 N. Y. 142), and *Waterloo W. Mfg. Co.* v. *Shana-*

*han*, (128 N. Y. 345), that, as against the state, no title to the river could be obtained through private use, or occupancy, whether adverse or by permission, however long continued, or by prescriptive right.  Judge WILLARD BARTLETT agrees with the chief judge in that view.  Judges WERNER, CHASE and HISCOCK prefer to express no opinion upon that question. Upon all the other questions discussed all of my associates concur with the opinion ; except Judge COLLIN, who takes no part in the decision.

The judgment appealed from should be affirmed.

CULLEN, Ch. J., WERNER, WILLARD BARTLETT, HISCOCK and CHASE, JJ., concur ; COLLIN, J., not sitting.

Judgment affirmed, with costs.