ALLEN M. BREWER, Plaintiff, *v.* FRANK J. MOORE and PAUL SCARLOTOS, Defendants.

Fourth Department, March 13, 1918.

Real property — ejectment — judgment — prior decision determining that defendant has no title — prior decision controlling in action involving same issues.

Action in ejectment to recover possession of lands situate on a beach of Lake Ontario. In a prior action in ejectment against the same defendant brought by another plaintiff and involving the same land titles, it was held that the defendant's exceptions upon a case ordered to be heard at the Appellate Division in the first instance should be overruled and judgment ordered for the plaintiff. In the present case there is no new testimony bearing upon the construction of the deeds under which the parties claim which would require or support a different interpretation of said deeds. Accordingly *held*, that the defendant's exceptions in the present case should be overruled and judgment directed for the plaintiff.

MOTION by the defendants, Frank J. Moore and another, for a new trial upon a case containing exceptions, ordered to be heard at the Appellate Division in the first instance after the rendition of a verdict in plaintiff's favor by direction of the court upon a trial before the court and a jury at the Monroe Trial Term in April, 1917.

*Richard R. Powell* [*O'Brien & Powell,* attorneys], for the plaintiff.

*Percival D. Oviatt* [*Wile, Oviatt & Gilman,* attorneys], for the defendants.

FOOTE, J.:

This is an action in ejectment to recover the possession of two small parcels of land situate on the sand beach of Lake Ontario near and somewhat west of the point on the lake shore where the westerly line of Irondequoit bay produced north across the sand bar would strike the lake.

The trial court ruled as matter of law that plaintiff was the owner and entitled to recover the premises, and left to the jury only the question of the amount of plaintiff's damages, which the jury fixed at $200. This ruling was based upon the decision of this court and the Court of Appeals in the case of *New York Central & H. R. R. R. Co.* v. *Moore* (137 App. Div. 461; affd., 203 N. Y. 615). That was an action in ejectment to recover of Moore, one of the present defendants, certain lands on this sand beach within the right of way line of the plaintiff there, adjoining or near the premises which are the subject of the present action.

The plaintiff here claims under the same title as did the plaintiff in that case, and the defendant Moore also claims under the same title and by virtue of the same deeds as in that case. The defendant Scarlotos is Moore's tenant in possession of both parcels as such.

There is no new testimony in this case bearing upon the construction of the deeds under which the parties claim such as would require or support a different interpretation of the deeds.

The so-called Cornell map made in 1852, upon which defendant placed considerable reliance in the *New York Central* case, and which was referred to in the opinions, was not introduced in this case, nor did the defendants introduce here the testimony of certain witnesses tending to show that by the action of the lake the shore had receded, and the lands which were the subject of that action, including the sand bar, were submerged, and that the present sand bar is almost wholly south of where it formerly stood.

It is the defendants' contention that because of the omission of that testimony from the present record there is now no basis for the following statement near the end of the opinion of Judge HAIGHT: " It is thus apparent from the defendant's own showing that the old sand bar as it existed in 1819 has disappeared, and that the mainland abutting thereon has been washed away for a distance more than sufficient to cover any claim that the plaintiff has made to the beach as it now exists."

There is perhaps more evidence now as to the precise location of the westerly end of the old sand bar bridge built in 1855.   The piles have been found still resting in the ground and their location indicates that the sand bar has not moved as far south as appeared by the testimony of defendant's witnesses in the *New York Central* case.

This case must, I think, be decided as was the other on the construction of the deeds.

Defendants' present counsel has abandoned one of the defendant's main contentions in the other case, namely, that the easterly line of the Woodman 100-acre lot was not the shore of the Irondequoit bay, but the so-called Johnson traverse line running along the top of the high bank.   His present contention is that the northeast boundary of the Woodman 100 acres is, according to the Johnson survey, a line beginning at the point of high land opposite which is the letter " A " on the so-called Johnson map, and running thence north sixty-seven degrees west, nine chains and seventy-five links.   This line, it is claimed, will end at the shore of the lake as it existed in 1819, the supposed date of Johnson's survey.

If this is the correct northeast boundary of the Woodman 100 acres, then our decision in the *New York Central* case was wrong, and all or at least the greater part of the lands adjudged to be the property of the railroad company in that case is, in fact, the property of the defendant Moore.   The same claim was urged by counsel for defendant Moore in that case, as clearly appears by the opinion of Judge HAIGHT in the Court of Appeals, but that court found that even if the claim was good, it would not avail the defendant, since the evidence showed that by the changes in the shore line,

the land lying to the north and east of such a line is now under water and that the lands defendant Moore was in possession of would be south and west of that line. Since the evidence upon which this conclusion rested is absent from the present record, we must now determine, without the aid of that testimony, where, according to the deeds, the line should run which divides the sand bar from the Woodman 100 acres.

As we interpret the decision of the Court of Appeals, it did not place a different construction upon the deeds than that adopted by this court. It neither adopted nor rejected our construction, because it held that on either construction the judgment was right.

The common source of title of both parties is John Hornby. Hornby, prior to September 21, 1815, was a part owner with the Duke of Cumberland and others of a tract of land of about 5,000 acres lying between the Genesee river on the west and Irondequoit bay on the east, and bounded by Lake Ontario on the north. By a partition deed made September 21, 1815, there was set off and conveyed to John Hornby by the other owners, among other parcels, the following: " A lot in the northern part of said township No. 14, and bounded as follows: On the east by the Irondequoit Bay; on the north by Lake Ontario; on the west partly by Lot No. 22, containing 494.56 acres, be the same more or less." Also: " The lot called the sand bar lying between the Bay and the Lake and adjoining the last described lot, containing 15.71 acres, be the same more or less. * * * Reference being herein had to Ezra Phelps map and survey of said township, as well as to the plan hereunto annexed will plainly appear."

Attached to this deed and recorded therewith in the Ontario county clerk's office October 4, 1815, is a map of the whole tract, evidently a copy of the Ezra Phelps map. This map shows a subdivision of the whole 5,000 acres into fifty-one numbered lots, leaving three parcels not so divided or numbered. J. Hornby's name is written upon the several parcels conveyed to him by the partition deed. The map shows the 494.56-acre parcel at the northeast corner of the tract, which was not subdivided into lots by Phelps, and the sand bar 15.70 acres adjoining, and shows the line of division between

the sand bar and the main land to be a line running across the sand bar to the lake in exact continuation of the general line of the shore of Irondequoit bay. The copy of this map in evidence is the copy now in the Monroe county clerk's office copied from the original in Ontario county clerk's office some time after the former county was set off from the latter. On the copy in evidence there is a recent partial erasure of this line which divides the sand bar from the main land, but sufficient remains to show that there was such a line on the map. The original of this copy from the Ontario county clerk's office is not in the record. No cove is shown such as appears on the so-called Johnson map. Defendants' witness Storey suggests that this line dividing the sand bar from the main land in a wavy line indicates water. I find nothing to justify this opinion as the map clearly shows that the line runs on land, and this is confirmed by Phelps' field notes of the undivided lot (Exhibit 19) in which he describes the course of the west bounds of the sand bar as beginning at the northwest corner of the bay, thence north twelve poles to the lake. It is apparent that there was no attempt to draw with accuracy upon this map the various indentations of the shores of the bay, lake or river, but they were sufficiently accurate at this northwest corner to permit Phelps to ascertain the quantity of land in the undivided lot and in the sand bar to a fraction of an acre. If the so-called cove existed at that time, it was treated by Phelps as a part of the undivided lot, and the sand bar as extending westerly only to the general line of the main shore of Irondequoit bay projected north to the lake. Thus all the shore of the lake in front of the undivided lot was made a part of that lot.

February 1, 1819, John Hornby conveyed 100 acres to Sylvester Woodman, describing the land as " being 100 acres in the undivided lot in the northeast corner of said township adjoining the sand bar, said 100 acres bounded as follows: Beginning at the northeast corner of said lot; running thence westerly along north line of lot, being the lake shore 100 rods; thence south parallel with the west line of lot so far that a line drawn from thence easterly parallel with the south line to the east line of lot, being the shore of Gerundegut [Irondequoit] Bay and thence northerly along

said east line of lot to the place of beginning, will contain 100 acres and no more." At the time this deed was given there was, so far as appears, no other survey or map than the Phelps map attached to the partition deed. The undivided lot referred to is the 494.56 acres, and the beginning point of this description " at the northeast corner of said lot " is the north end of the line shown on the map separating the sand bar from the main land and in continuation of the line of the shore of the bay. The reference in the deed to the northeast corner of the lot must be to the Ezra Phelps map, for there was no other map at that time and there was no way of finding the northeast corner of the lot except from that map. Comparing Woodman's deed with the map recorded with the partition deed, it plainly appears that Woodman was granted all the lands along the shore of the lake up to a line in continuation of the main shore of the bay. Furthermore, the first line of the description is, " running thence westerly along north line of lot, *being the lake shore* 100 rods," from which it appears that all of Woodman's north line is along the shore of the lake,— *not along the south shore of the cove* for a considerable distance, as defendants now contend. The last course of this description is, " and thence northerly along said east line of lot to the place of beginning." If there was a cove extending west of the general shore line of the bay immediately south of the sand bar, then this last line, according to the description, would extend across the mouth of this cove to and across the sand bar, rather than around the water line of the cove as the shore of the bay, for such is the east line of the lot as shown on the Phelps map.

Assuming, as we must, that the north and east lines of the Woodman 100 acres are fixed by the Phelps survey and map of the undivided lot, it follows that Woodman acquired title to all the shore of the lake in front of his upland and as far east as the general line of the west shore of the bay produced northerly to the lake.

Hornby, as has already been stated, acquired his title to the sand bar by the same partition deed by which he acquired title to the undivided lot. He did not part with his title to the sand bar until about seven years after he had conveyed the 100 acres to Woodman. By deed dated October 4, 1825,

recorded June 4, 1826, he conveyed the sand bar, or his interest therein, to Roger Bronson, describing it as containing about fifteen acres more or less and " bounded on the west by the east line of a tract of 100 acres sold to Sylvester Woodman." Defendants claim their title by mesne conveyances from Roger Bronson. It is, of course, apparent that Bronson acquired only such part of the sand bar as had not been conveyed to Woodman. If there was in fact some sand bar west of Woodman's east line, Bronson did not get it.

I come now to the so-called map and survey of Elisha Johnson upon which defendants base their chief reliance. There was produced upon the trial certain maps and field notes, which had been at some time collected together and bound into a book containing fourteen pages. It purports to contain maps and surveys of several parts of the towns of Brighton and Irondequoit. Mr. Moore, a witness for the plaintiff, testified that he was connected with the Abstract Guaranty Company, and that he obtained this book from the estate of F. J. M. Cornell, who was a surveyor and a son of Silas Cornell, also a surveyor, and that the book had been in his possession since 1889. He said that the map on page 3 includes the map of the Woodman lot, so called, and that the field notes on the two following pages are Johnson's field notes. On this testimony, the map and field notes were received in evidence. There is nothing to identify the map as being Johnson's work. It bears no date or signature, nor does Johnson's signature appear on it anywhere. No witness identifies any of the writing or marking as the work of Johnson. A letter purporting to be signed by Johnson, addressed to Messrs. Howell & Greig, appears on the second page of the book, which bears no date, but it refers to " old field notes and map made about 30 years ago." Nothing in this letter identifies the map on the next page as being the map referred to. On the contrary, the map of the whole township on page 14 seems to be the one to which he refers. It seems, however, to be conceded by both parties that the field notes beginning on page 3 are the work of Johnson. These field notes are without date, but it seems to be taken for granted that they were made in or about the year 1819. It is a mere matter of conjecture as to whether the map on page 3, which is

Exhibit 26, was made by Johnson, or if it was, whether it was made at or near the time when the field notes and survey were made. The scale of the map is not given. It is on this map that the so-called cove immediately south of the sand bar first appears.

Assuming that these field notes and map were made by Elisha Johnson some time in 1819, but after the deed of the 100 acres to Woodman, I think they contain nothing that would justify any different construction of the grant to Woodman from the one already suggested. In the first place, it is apparent from the field notes themselves that Johnson was employed to make this survey by the owners of the remaining lands in the undivided lot in order to subdivide those lands into smaller lots for the purpose of a partition and division of the same among the owners, for at the conclusion of the field notes he says: " The subscribers here agreed in the following divisions of this tract." Then follows the division into three separate parcels of the different lots to the different owners. Then follows this clause: " The Woodman 100 acres the purchase money or the amt. sold for to be divided. The bar or point of land lying between the bay & lake is considered of no value to the proprietors and to remain in common & undivided."

The field notes begin as follows: " Field Notes of the undivided lot lying in Township No. 14, 7th Range and at the intersection of the Irondequoit Bay with Lake Ontario First layed off 100 acres agreeable to I. Woodman deed Beginning at the intersection of Bay and Lake Ontario and at the neck of the bar at A on map. Thence N. 67 degrees W. 9 ch. 75 l. Thence N. 82 degrees W. 15 ch. 25 l., along the Lake. Thence South 58 ch. Thence East 13 ch. 10 l. to the Irondequoit Bay." Then follow fourteen different courses and distances and opposite the last one the words, " along the bay to the place of beginning containing 100 acres." Then follow his field notes of the residue of the undivided lot, and separate field notes of each of the eight subdivision lots into which he subdivided this residue.

It is to be observed that Johnson was not employed by Woodman to survey his 100 acres, and there is nothing to show that Woodman was in any way bound by what Johnson

did. Indeed, Woodman's title could not be affected by anything which Johnson did. It is to be observed that his object in running the lines of Woodman's 100 acres was so as to locate Woodman's west and south lines. The north and east lines were the shores of the lake and bay and were already established. It was necessary for him to find out where the west and south lines should run so as to include just 100 acres, but to make the necessary computations, he required surveyor's lines along or near the shores, and it was for that purpose only that these north and east lines were run. Land was plentiful and of small value in those days and surveys of wild lands were not made with precision and accuracy; indeed, Johnson found a surplus of 175 acres in this undivided lot more than the 494 acres allotted to it by Phelps.

But it is said that taking the map (Exhibit 26) with the field notes, that Johnson began his survey at the point A on the map which is the point of land on the bay south of the sand bar and south of the cove which runs in between this point and the sand bar, and that his first course sixty-seven degrees west, nine chains, seventy-five links, would carry the line along the south shore of the cove and in that line continue to a point on the shore of the lake west of the lands in controversy in this action leaving all those lands north of that line.

I think it by no means follows that this is the true interpretation of Johnson's survey. He himself says that he begins " at the intersection of bay and Lake Ontario." The words " and at the neck of the bar at A on map " do not change the starting point, but serve to fix its location on the shore of the lake. He evidently considered that the sand bar and the main land were connected by what he called " the neck of the bar " as distinguished from the bar itself.. He was running straight lines from which to compute the quantity of land he inclosed and not traverse lines at the water's edge.

In view of the language of the Woodman deed which Johnson had before him and the statements contained in his field notes, I think his point A on the map was intended to mark the point of high land opposite which it was placed as the monument, not of the beginning point of his survey, but of the line to the lake shore which was his beginning point. As was stated by Judge GRAY in *Fulton Light, H. & P.*

*Co.* v. *State of New York* (200 N. Y. 400, 416): " As a boundary of the grant is on a fresh-water river, the location of the monument for the starting point in the sapling is not a delimitation of the westerly boundary line. As the monument could not conveniently or properly be placed in the channel of the river, in placing it on the bank it merely fixed a point in the south line; to which line the course from the northerly boundary returned along the river. Such a monument indicates the place of the line, or of its intersection with the stream, and not the end of it." (Citing *Luce* v. *Carley,* 24 Wend. 451; *Van Winkle* v. *Van Winkle,* 184 N. Y. 193.)

It is perhaps difficult to say whether by the words " along the Lake " opposite the second course Johnson intended to indicate that both these courses were along the lake. Opposite his fourth course he says " to the Irondequoit Bay." He puts nothing opposite the next thirteen courses, but opposite the fourteenth he puts " along the bay," indicating apparently, though not necessarily, that all the previous thirteen courses are, as we know they should be, along the bay. But, however that may be, it is reasonably certain that Woodman's deed gave him all the shore of the lake in front of his upland without reference to any cove, and I think his successors in title should not be deprived of any of it by anything that Johnson did in the interest of Woodman's grantors. It is evident that the lines which Johnson ran along the bay are not intended as a traverse of the bay shore but ran on the high land a considerable distance from the shore. It appeared in the *New York Central* case that there were some 10 acres of land between the line as run by Johnson and the bay shore. If this was his method, I assume he followed it on the lake shore, and that the two straight lines are run not on but near enough to that shore to enable him to compute with sufficient accuracy where he must place the west and south lines to make 100 acres. It may be that he considered the sandy shores of the lake and the steep cliffs of the bay as of no value, and that he ran his lines in an effort to give Woodman 100 acres of tillable land and so was liberal toward Woodman, but this would not affect Woodman's right to the shore of the lake and the bay in accordance with his deed.

If we go by the deeds there is little or no doubt that the

lands here in question were part of Woodman's 100 acres. If it would be otherwise had Woodman's deed been made according to Johnson's survey and the map which is attributed to Johnson, still Woodman's deed must control.

On September 22, 1865, there was conveyed by Nehemiah C. Bradstreet and wife to Remsford P. Bradstreet 3 acres of the Woodman 100 acres by the following description: " Conveys parcel in northeast corner of Township Number 14, Short Range of Townships east of Genesee River, beginning at the west end of the Sand Bar Bridge in said town as it formerly stood and as now indicated by posts or timbers of said bridge now remaining; thence westerly along shore of the Lake about 18 rods; thence southwest and nearly south along the hollow or ravine to a stake as heretofore set; thence in a southeasterly direction 168 feet to the nearest oak tree on the north side of a ravine leading to the shore of the Bay; thence directly east to the shore of said Bay, thence along the shore of said Bay to the place of beginning, containing just three acres and being premises known and occupied as the Sea Breeze House, and lands, with all the privileges and appurtenances and rights appertaining thereto so as to include in this grant three acres more or less as hereinbefore described."

The starting point on this survey is the west end of the sand bar bridge which was located on the point of high land south of the sand bar at the point A marked on the so-called Johnson map. That bridge was built in 1855, because at that time a channel had opened from the bay into the lake at the place where the cove is shown on the map and access from the high land to the sand bar could not be obtained without a bridge. Two or three years later this bridge was washed away because of high water, and at that time the sand bar was almost wholly submerged. How long this submergence lasted does not clearly appear, but the sand bar reappeared and the opening to the lake closed up, and some of the witnesses say that the sand bar was moved south or reappeared south of its original position. Just what the conditions were in this respect at the date of this deed in 1865 does not clearly appear. But whether there was land north of the posts and timbers of the old bridge then left standing is not, we think, material.

Apparently, these posts and timbers were practically on the shore of the lake, for the line runs " thence westerly along shore of the Lake." At any rate, within the principle of the quotation we have made from the opinion of Judge GRAY, these posts and timbers, if not on the actual shore of the lake, must be regarded as monuments in the line to the actual shore which is the beginning point. All the lands in controversy lie west of such a line, and such a line is, in fact, the same line as the east line at that point in the deed to Woodman. Plaintiff's title comes from Remsford P. Bradstreet under the above deed by the same description.

For these reasons, as well as those stated in the opinion of ROBSON, J., in the *New York Central* case, we think the defendants' exceptions should be overruled and the motion for a new trial denied, and judgment directed for the plaintiff upon the verdict, with costs.

All concurred.

Defendants' exceptions overruled, motion for new trial denied, with costs, and judgment directed for the plaintiff upon the verdict, with costs.