LITTLE FALLS FIBRE COMPANY and Others, Plaintiffs, *v.* HENRY FORD AND SON, INCORPORATED, Defendant.*

Supreme Court, Saratoga County, August 20, 1926.

Waters and watercourses — action to compel defendant to remove flash-boards placed on Federal dam. in Hudson river at Troy — defendant had license from Federal government to place flashboards — flash-boards infringe plaintiffs' riparian rights to power above dam — defend-ant compelled to remove flashboards and pay damages.

The plaintiffs are the owners and in the possession of certain land, riparian rights, water rights and water power rights on the Hudson river above Troy. The defendant, with the permission of the Federal government, is using water power developed by the Federal dam at Troy. The defendant procured a license to erect on the Federal dam at Troy flashboards two feet high, but such license, granted under the Federal Water Power Act, expressly provided that the licensee should be liable for all damage caused to the property of others. The effect of the erection of the flashboards is to materially decrease the water power at the plaintiffs' plants. The defendant cannot maintain the flashboards and is required to remove them and pay to the plaintiffs the damages suffered by them.
The defenses that the defendant is protected by the license granted and that it acted merely as agent of the Federal government are without merit.

SUIT in equity for a permanent injunction restraining the defend-ant from maintaining flashboards on the Federal dam in the Hudson river at Troy, for the removal of such flashboards and for the recovery of money damages claimed to have been sustained by the plaintiffs by reason of their erection and maintenance.

*Thomas O'Connor* [*George E. O'Connor* of counsel], for the plaintiffs.

*Whalen, Murphy, McNamee & Creble* [*Robert E. Whalen* and *Charles E. Nichols, Jr.*, of counsel], for the defendant.

HEFFERNAN, J. The plaintiffs are manufacturing corporations and are the owners and in possession of certain land, riparian and water rights, and water power rights, in, on, under and along the northernmost branch of the Mohawk river west of its confluence with the Hudson river in the town of Waterford, Saratoga county, N. Y., which constitute a site for the development of water power

---

* See, also, 126 Misc. 126.

usually known as Kings Canal Development. The Mohawk and Hudson rivers are navigable streams at all points involved in this controversy. About the year 1828 the respective predecessors in title of the plaintiffs constructed at the point indicated a dam for the development of water power, and in connection therewith an hydraulic canal along the bank of the river. Between the canal and the river they erected mills. For practically a century the plaintiffs and their predecessors have continuously and jointly owned, possessed, used, occupied and maintained the dam and canal for the purpose of developing and utilizing the water power by means of hydraulic works upon parcels of land severally owned by them for the operation of machinery in their factories.

At Troy, at a point about three miles down stream from the plaintiffs' plants, the State of New York constructed, about the year 1823, a dam across the Hudson river with a crest elevation of 13.23 Barge Canal datum (abbreviated B. C. D.). This is the datum customarily used by the State of New York in the vicinity of the premises involved. This datum is 0.87' below the datum known as mean sea level at Sandy Hook, which latter datum is used by the United States engineers in the same vicinity. The old State dam had a lock in its easterly end for the passage of boats which went up the Hudson, turned into the north branch of the Mohawk river and thence into the locks which elevated the boats to the old Champlain canal. These old locks were located immediately north of the present lock No. 2 Erie canal. Prior to 1915, and in the course of the Barge canal construction, a new lock known as lock No. 2 Erie canal was erected at Waterford.

In 1915 the United States of America constructed a dam across the Hudson river between Troy and Green Island, replacing the old State dam which had theretofore existed in the river near the same location. This is commonly known as the Troy dam, is situated about 15,000 feet below the plaintiffs' plants, and consists of two spillways, the more easterly being known as the main spillway and the more westerly being known as the auxiliary spillway. The crest of the easterly spillway is approximately 586 feet long and its elevation is 15.2 B. C. D. The crest of the westerly spillway is approximately 669 feet long and its elevation is 17.2 B. C. D. The construction of the Federal dam was authorized by act of Congress entitled: " An Act Making Appropriations for the Construction, Repair and Preservation of Certain Public Works on Rivers and Harbors and for Other Purposes," approved June 25, 1910 (36 U. S. Stat. at Large, 630, 635, chap. 382). A further appropriation for the construction of the dam was made by the act of Congress, similarly entitled, approved

March 4, 1913 (37 U. S. Stat. at Large, 801, chap. 144). When the government built the dam it provided on the main spillway concrete holes for the installation of flashboards. The Federal dam was also provided with a lock in its easterly end and backed the water up to lock No. 2 Erie canal so that boats could pass through the lock at Troy, thence up the Hudson and into the north branch of the Mohawk and thence through lock No. 2 westerly to Buffalo. From 1915, when the lock and dam were put into operation, until June, 1925, no flashboards were used.

In 1921 the defendant procured a license from the Federal Water Power Commission, a body consisting of the Secretary of War, the Secretary of the Interior and the Secretary of Agriculture and established by the Federal Water Power Act (41 U. S. Stat. at Large, 1063, chap. 285), for the construction, maintenance and operation of an hydro-electric power plant at the Green Island end of the Federal dam for the development of water power and the conversion of the same into electrical energy. In its application the defendant stated that flashboards two feet in height would be used on the main spillway section of the dam, utilizing the holes provided for that purpose in the spillway crest, but that no flashboards would be used on the auxiliary spillway section. The license issued to the defendant authorized the construction, maintenance and operation of the power plant, and this project, known and designated by the Commission as project No. 13, was determined by that body as prescribed in section 4(d) of the Federal Water Power Act (Id. 1066) to be " desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce." At the time its application was filed for this license, the defendant was and is now empowered to utilize water power, and authorized to transact in this State all business necessary in effecting the purpose of a license under the Federal Water Power Act. In its application the defendant said " so far as navigation is concerned the effect of the power plant will be virtually negligible." The defendant's license was granted and accepted subject to all the terms and conditions of the Federal Water Power Act of June 10, 1920. The provisions of that act are expressly and in terms made part of the license. This act, in section 10, subd. (c), provides: " Each licensee hereunder *shall be liable for all damages* occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto, constructed under the license, and *in no event shall the United States be liable therefor.*"

Section 27 of the same act reads: " That nothing herein con-

tained shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of *water* used in irrigation or for municipal *or other uses, or any vested right acquired therein.*"

In 1922, in accordance with the permission granted by the Federal Water Commission, the defendant constructed its hydroelectric power plant on the Hudson river about 15,000 feet below the plaintiffs' plants, and since that time has operated the same by means of water drawn from the pool formed by the Federal dam. The defendant is not a public service corporation but delivers the power developed by it to the manufacturing plant of the Ford Motor Company at Green Island where it is utilized for private manufacturing purposes.

On September 22, 1924, the defendant requested permission from the War Department " to install flashboards on the Troy dam in connection with the operation of our power house." On January 12, 1925, the War Department granted such permission subject to certain regulations approved by the Secretary of War. These regulations provide for the maintenance of flashboards on the easterly spillway of the dam to a height of 17.2 B. C. D., which is the same as the height of the crest on the auxiliary spillway of such dam. ·

About June 16, 1925, the defendant installed flashboards consisting of two twelve-inch planks, two feet in height upon the main spillway of the dam. The purpose of the defendant in so installing the flashboards was to aid and improve the operation of its water power plant and to increase the power which it could procure therefrom.

The pool of the Federal dam at Troy extends to the tailraces of the hydraulic plants of the plaintiffs so that the elevation of the water at the dam is controlling upon the elevation of the water in the tailraces of plaintiffs' equipment. The maintenance of these flashboards on the dam increases the elevation of the water there with a consequent increase at the tailraces of the plaintiffs' plants. Since the elevation of the water at plaintiffs tailraces is controlled by the elevation of the water at the Troy dam and since any increase in the elevation of such water causes. a corresponding increase in the elevation of the water at plaintiffs' tailraces, it necessarily follows that any raise in the water at Troy reduces the head on plaintiffs' hydraulic equipment correspondingly with a proportionate reduction in the power available therefrom. So long as flashboards are maintained on the dam there is a continuous loss of power to plaintiffs from their hydraulic plants and also a backing of water upon their lands, building and equipment. By

reason of the erection of the flashboards on the dam, defendant has procured for its own use two feet of additional head and as a natural result a large amount of additional power.   The defendant concedes that the presence of these flashboards on the dam will cause to plaintiffs' plants, during sixty-five per cent of the time, an average loss of head of four one-hundredths of a foot.   The plaintiffs are dependent upon this water power for the operation of their machinery, and the direct result of the flashboards is to seriously reduce the power available to them.   In the last analysis, by its ingenious procedure, the defendant has taken two feet of head from the plaintiffs and has appropriated it to its own use. Certainly this is an invasion of the vested rights of the plaintiffs.

As complete justification for its acts, the defendant asserts two Federal defenses:

1. The title, right, privilege and immunity, set up and claimed by defendant, to erect and maintain the flashboards under the Federal Water Power Act, and a water power license issued by the Federal Power Commission to defendant, as supplemented by regulations of the Federal Power Commission approved by the Secretary of War.

2. Defendant's agency for the government of the United States in erecting and maintaining the flashboards for the benefit of interstate and foreign commerce, under the commerce clause of section 8 of article 1 of the Constitution of the United States.

The defenses interposed present only questions of law.   The defendant disputes liability upon the grounds, in substance, that it has a license from the Federal government to do the acts complained of, and that in so doing it is acting as a governmental agency.   If either or both of these defenses are sufficient, then the plaintiffs can establish at most a case of *damnum absque injuria.*

These plaintiffs, as riparian owners, have an absolute right to have the waters at their properties continued in their natural condition free from any interference or obstructions.   (*Pixley* v. *Clark,* 35 N. Y. 520; *Hall* v. *Augsbury,* 46 id. 622; *United P. & B. Co.* v. *Iroquois P. & P. Co.,* 226 id. 38.)   In the latter case, speaking of these rights, the court said: " The rule of law is familiar that each owner of land contiguous to a natural watercourse has a right, as owner of such land and as naturally connected with and incident to it, to the natural flow of the stream along his land and its descent, and all the force to be derived therefrom, for any domestic or hydraulic purpose to which he may decide to apply it.   He may, by means of a ditch or conduit, withdraw water from the stream and cause it to flow unnaturally through his land for agricultural, industrial or other purpose, provided he causes it,

in its substantial volume, to return upon his land to the stream. In order that he may enjoy those rights every owner is bound to use the water reasonably as it flows, so as not to injure the equal rights of all the owners. Whether or not a use or detention of the water is reasonable must be determined by the extent and capacity of the stream, the uses to which it is and has been put, and the rights that other owners on the stream have. The essential question in each particular case is what is reasonable under the conditions and circumstances there presented. Those are riparian rights, are natural and inherent, and a part of the estate of each riparian owner."

The rights of the plaintiffs, as riparian owners, are subordinate only to the servitude of the public for the purpose of navigation and commerce and to the governmental right of eminent domain within constitutional limitations. In the case of navigable streams, Congress has paramount authority to control navigation for the purpose of regulating commerce among the several States and foreign nations. (*Shively* v. *Bowlby*, 152 U. S. 1, 40, 58; *Gibson* v. *United States*, 166 id. 269, 272; *Scott* v. *Lattig*, 227 id. 229, 243.) It is not open to dispute that the Federal or State government may remove, or compel the removal of, structures erected in navigable streams.

The Fifth Amendment to the Constitution of the United States provides: " *Nor shall private property be taken for public use, without just compensation.*"

The improvement of navigation is a public use. The power of Congress to regulate commerce is subject to the inhibition of this amendment against the taking of private property for public use without compensation. When that power is exercised and private property is taken, it must be done in subordination of this provision. (*Monongahela Navigation Company* v. *United States*, 148 U. S. 312, 336; *United States* v. *Lynah*, 188 id. 445, 465, 471; *United States* v. *Cress,* 243 id. 316.) The government could take the lands of these plaintiffs and divert from their water-power properties the water power which operated them, but only upon making just compensation. The right of the Federal government to make improvement in navigable streams in facilitating navigation and in the interest of interstate and foreign commerce must be conceded. Where, however, under the plea of improvement of navigation property rights of a riparian owner are diminished by the diversion of the waters, a clear case is presented for the enforcement of the constitutional guaranty of compensation. The defendant contends that the damage of which the plaintiffs complain is the incidental consequence of a lawful and proper exercise of a governmental power and is merely incidental to the exercise

of the servitude to which their property has always been subject, and that there is no taking of property within the meaning of the constitutional provision, and that consequently they have no right to compensation. To that doctrine I am not willing to subscribe. Neither the State nor the Nation can intrude upon or invade a riparian owner's rights without subjecting itself to liability. The Federal government could not lawfully take plaintiffs' properties without making compensation. Obviously, it could not authorize the defendant to commit a trespass upon plaintiffs' rights. What the government cannot do directly, it may not do indirectly. To destroy property is to appropriate it. The destruction of the water rights of the plaintiffs at the level long existing is an appropriation of such property and neither the State nor the Nation can exclude the owners from the rights and benefits to which they were theretofore entitled without making compensation. (*Scriver* v. *Smith*, 100 N. Y. 471; *Pumpelly* v. *Green Bay Company*, 13 Wall. 166; *United States* v. *Cress, supra; Fulton Light, H. & P. Co.* v. *State of New York*, 200 N. Y. 400.)

The plea of the defendant that in the erection of the flashboards it was acting as agent of the United States government is a mere subterfuge. The Federal government could not commit a trespass upon the lands of the plaintiffs without making compensation. It could not authorize the defendant so to do. It cannot be seriously contended that the defendant erected this power house on behalf of the United States government. That work was done for its own advantage. The most that can be said is that the government permitted the defendant to do it. It is apparent from the sections of the Water Power Act to which reference has been made that neither Congress nor the Federal Water Power Commission assumed or pretended to give the defendant the privilege of injuring the properties of the plaintiffs. The conditions imposed in the license to defendant expressly negative any such idea or intention. Under these circumstances there is no basis for defendant's claim that the United States government gave it immunity to take the property of others. There is some evidence that these flashboards, in some indefinite degree, tend to improve conditions in navigation. It is admitted that in the construction of the dam the pool was designed to have an elevation of 15.2 B. C. D., and the channel was excavated to give a twelve-foot depth with the water at this elevation. It is, perhaps, true that some incidental benefit to navigation may result from defendant's act. The regulations approved by the Secretary of War provide that "flashboards may be maintained." This is permissive only and does not relieve the defendant from responsibility or liability. The provisions of

the license dispose of this contention. There it is specifically provided that "each licensee hereunder shall be liable for all damages occasioned to the property of others * * *," and that "in no event shall the United States be liable therefor." The plaintiffs have no right of action against the United States. It is elementary that no suit can be maintained against the government without express authority of Congress. (*Stanley* v. *Schwalby,* 162 U. S. 255; *United States* v. *Clarke,* 8 Pet. 436.) Here, the United States has not only not given its consent, but it has specifically provided against any liability. The conduct of the defendant constitutes a trespass upon the plaintiffs' property rights, and the license affords no justification for its act. It is not yet the law of the land that the *ipse dixit* of the Secretary of War, or of any other official, is sufficient warrant to justify a physical invasion of plaintiffs' property rights and leave them remediless.

The plaintiffs are entitled to a permanent injunction, and a reference will be ordered to ascertain the damages which they have sustained.

Judgment is hereby directed accordingly.