JOHN ROCHFORD and Another, Claimants, *v.* THE STATE OF NEW YORK, Defendant.

Claim No. 23586.

Court of Claims, September 20, 1934.

*Stanchfield, Collin, Lovell & Sayles* [*Pierre Evans* of counsel], for the claimants.

*John J. Bennett, Jr.; Attorney-General* [*John L. Campbell, Assistant Attorney-General,* of counsel], for the defendant.

*Herbert W. Smith,* for the Lehigh Valley Railroad Company.

RYAN, J.   Claimants were seized and in possession of a parcel of land consisting of seventy-one one-hundredths of an acre situate in the town and village of Van Etten, Chemung county. Their title extended back to January 3, 1838, and the land laid between the Susquehanna turnpike, now Waverly street, on the east and the Seneca Lake road, now Main street, on the north. Susquehanna turnpike, or Waverly street, runs in a direction from southwest to northeast and Seneca Lake road, or Main street, runs in a direction from slightly northwest to slightly southeast. They intersect at an acute angle, their boundary lines forming an apex of a triangle which with an unplotted line incloses approximately 1,101 square feet of land with which we are particularly concerned. The unplotted line is determined by a row of boulders, seven in number, stretched in an arc across the front of the building on the premises. bordering on a grass plot and painted white. The property is improved with a frame structure which has stood upwards of one hundred years and which constitutes the village hotel. It faces towards the intersection, its main entrance located directly southwesterly of the triangular plot of ground.

The intersection of Waverly and Main streets in front of claimants' premises is the business center and " Four Corners " of the village of Van Etten. From this point Waverly street extends northeasterly, becoming Front street. Running from the intersection to the southeast is Warner street, which crossed the Lehigh Valley railroad at a grade at a point several hundred feet distant from claimants' property.

Pursuant to chapter 678 of the Laws of 1928, the grade crossing on Warner street was eliminated. In bringing about this elimination Warner street was cut off and a new road constructed lying between Warner street and Waverly street, its center line running practically due south from the apex of the triangle hereinabove described. As this road proceeded south it was graded up and carried over the railroad on a bridge structure. Final approval of this elimination work was given by the Public Service Commission on February 13, 1934.

Prior to the work of elimination, the 1,101 square feet of land comprising the triangular piece was rough and rutted and consisted merely of the natural soil and gravel lying between the intersection of the two streets. Unquestionably it had been driven over and upon for many years by users of the public highway, particularly in making a short cut from Waverly street into Main street, or *vice versa*. With the closing of Warner street and the opening of the new road this triangular piece was brought directly into the line of traffic and if left in its natural state would have become a serious menace to travel. A view of the situation would convince any reasonable person of the necessity of acquiring this triangular piece of land and including it as part of the public highway. This so impressed the engineers for the State that under their direction the contractor who was completing the elimination work proceeded on or about July 8, 1933, over the vigorous protests of the claimants, to fill in the rough and rutted spot with gravel, finishing the same a few days later with a tar and stone compound which was rolled down and leveled to an approved smooth road surface. Thenceforth the eye of the traveler found no distinction between the surface of the 1,101 square foot piece and the surface of the adjoining Waverly street and of the new road. In other words, the action of the State made the 1,101 square feet of land indisputably a physical part of the highway.

Before us is the question, What was the legal status of the 1,101 square feet of land prior to July 8, 1933, and what was the legal effect of the State's action? We repeat that there is no question in this case that under their deeds and chain of title, the claimants were seized in fee of the 1,101 square feet of land. They have never dedicated it to the public use.

Claimants have proceeded upon the theory that the State by its action has entered into permanent possession of the said parcel and has actually and permanently taken and appropriated it for railroad grade crossing elimination purposes and that they are entitled to be compensated in damages for the difference between the fair market value of their whole property just prior to the

taking and the value of the remainder immediately thereafter. Concededly no map or description of the land in question has been approved by or filed in any department of the State or filed in the Chemung county clerk's office, and no notice of appropriation has been served upon the claimants. This is the first defense of the State. We shall return to it later.

The chief defense is that the triangular piece of land in question had become a highway by user. In support of this many witnesses were called; some whose recollection went back beyond fifty years. In general this testimony was to the effect that the triangular piece of land had never been barricaded or posted with signs and had always been driven over and was always in the same condition of gravel and dirt prior to July 8, 1933. One of the most important witnesses for the State was Fred Hotchkiss, who was seventy-eight years old and had lived in the village since 1881 and prior to that time had lived nearby. He testified that he had known the property for fifty-seven years and from 1886 to 1898 had owned and operated a dray; that he used to drive over the triangular piece from Main street to Waverly street and Waverly to Main and traveled this piece of land probably twelve or fifteen times daily. That he would drive up onto the triangle to unload his dray and also stopped and stood his horses there using it for his stand. The effect of the testimony of this witness was lost, however, when he testified in substance, " Burch used to let me stand there. I had his permission to do that." The record shows that Corydon Burch was the owner of the property from June 11, 1881, to March 18, 1891.

The claimant John Rochford testified that he was seventy-nine years old and had been acquainted with the property since 1878, He bought it in 1915. Since coming into possession of it, he testified that he had kept the triangular piece rutted and covered with stones so that people would not drive on it; that his predecessor in title, Kendall, did the same thing. Claimant Rochford testified to repeated attempts of the street commissioner of the village of Van Etten to fill in the triangular piece and level it off and that at each attempt claimant forbade this being done and it was not done.

Claimant having established title to the property in question, the burden was on the State to establish that this land had become a highway by user. Upon the whole record, we find that the State has failed to meet this burden. As in the leading case on this question, the evidence produced by the State may be reduced to one sentence to the effect that the triangular piece of land was " used by the public generally." This is not sufficient.

" But the mere fact that a portion of the public travel over a road for twenty years cannot make it a highway; and the burden of making highways and sustaining bridges cannot be imposed upon the public in that way. There must be more. The user must be like that of highways generally. The road must not only be traveled upon, but it must be kept in repair or taken in charge and adopted by the public authorities. We think all this is implied in the words ' used as public highways.' Although the owner of land may not dedicate it for a public highway, and may not intend or assent that it shall become such, yet if he permits it to be used in the way just indicated for twenty years it would be deemed a public highway, and he will not be permitted to question the public right." (*Speir* v. *Town of New Utrecht*, 121 N. Y. 420, 429, 430.) (See, also, *Smith* v. *Smythe*, 197 id. 457, 461; *Johnson* v. *City of Niagara Falls*, 230 id. 77, 82, 83.)

The claimants having been seized in fee of the land, and we having reached the determination that there was no highway by user, we come to the question, Did the action of the State which occurred on July 8, 1933, amount to an appropriation of the claimants' property?

The defense urges that if the land in question was not part of the public highway previous to July 8, 1933, it is not now a public highway and will not be until the State has been in undisputed possession and has cared for it for a period of twenty years from that date, and that the only damages, if any, that claimants can collect are " for occupancy of the land from July 8, 1933, to the date of the filing of the claim, together with any permanent damage suffered by the property during this alleged occupancy by the State." It is argued that, so far as the title and the right to use and control the triangular piece is concerned, claimants have all the right, title and interest that they ever had, and that the most they can recover herein is an award for damages for a temporary illegal trespass upon their property. We do not believe that counsel for the defense can be serious when he argues that claimants now have all the right, title or interest that they ever had. It would be interesting to see them exercise their rights or attempt to do so by, for example, erecting a fence along the two sides of their property bounded respectively by Main and Waverly streets. One of the uses to which the triangular piece was previously put, and this is undisputed, was a parking place for automobiles owned by patrons of the hotel. No prudent person, we venture to say, would leave his automobile parked on the triangular piece under existing conditions. One of the uses to which the triangular piece might be put, according to a value expert who testified, would be the location

of a gasoline station. Certainly a gasoline station on this site under present conditions would be no differently situated than a gasoline station in the center of any dedicated public highway. We have in mind the decision of the Appellate Division, Fourth Department, 1924, in *Weismantle* v. *State* (210 App. Div. 608), wherein the court said: " The State urges that it did not appropriate any of claimant's property or rights. But it is clearly established that, even though no part of claimant's farm was actually touched by the Barge Canal construction, the lowering of Fish creek, into which Wood creek emptied, caused the waters to flow much more rapidly than ever before with the result that claimant's lands were washed away and she sustained serious damages. It was an appropriation of claimant's property even though no notice or map were served on her showing that portions of her property would be taken, but the filing of a map and serving of such notice was not the only method by which the State could appropriate property for use of the improved canal. (*American Woolen Co.* v. *State of New York*, 195 App. Div. 698; *Fulton Light, Heat & Power Co.* v. *State of New York*, 200 N. Y. 400.) "

Defense counsel urges that these cases do not apply for the reason that they were decided under the Canal Act, which authorized the State Engineer to enter upon and appropriate the land first and then make the map, certificate, and serve the notice on the owner afterwards.

Subdivision 3 of section 5 of chapter 678 of the Laws of 1928 provides: " On the filing of such description and map in the office of the department of state, the people of the state of New York, their officers and agents, may immediately enter upon and take possession of the lands so described for the purpose of the elimination of any crossing."

We think counsel has overlooked an important sentence which appears in the opinion of Mr. Justice DAVIS in *American Woolen Co.* v. *State* (*supra*), from which we quote as follows: " One method always used by the State in exercising the right of eminent domain is by entry and occupation summarily and without notice to the owner." Certainly the State has pre-empted 1,101 square feet of the claimants' property. Is it now to be permitted to say that because it did not observe certain preliminary formalities the State is to enjoy the property without properly compensating the owners thereof? Justice requires that the answer be in the negative. We do not find the decision in *Van Alstine* v. *Belden* (41 App. Div. 123; affd., 161 N. Y. 661) to be in conflict with the conclusion which we reach.

The defense argues that the State possesses nothing to show its title or the amount or form of it if it had the title and that a decision in favor of the claimants by this court allowing them damages as for permanent appropriation will not take the title from them or place it in the State. While it is true that our court does not ordinarily determine questions of title to real property and while it is true that decisions of this court are not ordinarily recorded in the county in which the real property is located, what is to prevent a certified copy of such a decision being so recorded? Or cannot the State now serve a map and certify and record the same? Will not the claimants willingly quit the claim and convey title to the property in question upon accepting payment of any award we may give? It seems to me that these objections are of minor moment and can be easily remedied.

But there is yet another provision in the statute which it seems to us gives this court jurisdiction to make an award herein. This is found in section 6 of chapter 678 of the Laws of 1928, which reads as follows: " If the work of such elimination causes damage to property not acquired as above provided, the state shall be liable therefor in the first instance, but this provision shall not be deemed to create any liability not already existing in law. Claims for such damage may be adjusted by the department of public works with the approval of the railroad corporation or corporations and * * * if the amount thereof can be agreed upon with the persons making such claims, * * * any amount so agreed upon * * * shall be * * * part of the cost of such elimination as prescribed by this act. If the amount of any such claim is not agreed upon, such claim may be presented to the court of claims which is hereby authorized to hear such claim and determine if the amount of such claim or any part thereof is a legal claim against the state and if it so determines, to make an award and enter judgment thereon against the state, provided, however, that such claim is filed with the court of claims within six months after final approval of the elimination work by such commission."

This section has been construed by the Court of Appeals in *Van Aken* v. *State of New York* (261 N. Y. 360) and by the Appellate Division in *Adamo* v. *State of New York* (235 App. Div. 12).

Likewise this court has followed the doctrine that if none of the claimants' property has been taken, damages caused by the closing of the railroad crossing were *damnum absque injuria*. (*Miller* v. *State of New York*, 229 App. Div. 423.)

But here a portion of claimants' property has been taken and would not have been except to complete in a proper and safe manner the construction of the elimination work. Likewise damage has

been caused to property not taken, viz., the balance of claimants' lands remaining to them. Therefore, claimants are entitled to recover herein according to the rule of damages asserted, *i. e.*, the difference between the value of the whole property prior to the taking and the value of that remaining to claimants immediately thereafter. We find this difference in value to be the sum of $3,500, for which amount, together with interest from the 8th of July, 1933, we make an award.

ACKERSON, J., concurs.