Alexander Del Gtorno, J.
The above claims were tried jointly upon stipulation of the parties which also provided that a separate determination as to each would be made by the court.
The claimants owned contiguous parcels of land allegedly appropriated de facto by the State by virtue of flooding of same resulting from the construction of the Palisades Interstate Parkway section in the Tappan area of Rockland County. Concededly, no maps affecting these two parcels were ever filed or served by the State,
*795 McOafferty entered into a binder agreement on March 28, 1955 with one William C. Mabie and his wife, for the purchase of some 20 acres of land for $2,250 per acre. This agreement culminated in the delivery to him of a deed on June 19, 1956, which specified the described property to contain 19.31 acres, for a consideration of $43,447.50, or $2,250 per acre as in the binder provided. By the terms of this deed the sellers assigned to McOafferty all the rights and claims they then may have had or in the future might have against the Palisades Park Commission and the State of New York.
On April 4,1956, or two and a half months before taking title, McOafferty filed in the Town of Orangetown, Rockland County, a subdivision map (claimants’ Exhibit 12) which indicated plots of approximately 100 feet by 150-feet dimension. Twenty-seven were acceptable to the town for building thereon and 11 were not. These 11 were marked “ Omit ”. Roughly, this subdivision formed a rectangle extending roughly north and south. The lots marked “ Omit” were on the southerly extremity of the rectangle. Damages are claimed to these 11 lots, which in the claim are described as follows: ‘ ‘ All those certain lots referred to and described in a certain map filed with the County Clerk of Rockland County in Book 57 at page 9, on July 16, 1956 and known as Map No. 2437, said lots being lots #4, 5, 6, 7, 8, and 9 in Block D and lots #2, 3, 4, 5, 6 in Block C, all of said lots and blocks containing approximately 6% acres, more or less.” Although lots are specified herein for easy referral to claimants’ Exhibit 12, it is to be noted that the claim for the alleged damages is on the basis of acreage.
Within these lots, at the very southerly extremity thereof, was Rabbit Hill. This hill, which was as much as 35 feet higher than the adjoining “Omit” lots in McCafferty’s land, encompassed, substantially, lot 6 and part of lot 5 in Block C, and lot 9 and at least half of lot 8 in Block D, as well as the proposed Pine Tree Lane between Blocks C and D in the said claimants’ Exhibit 12. The court ascribes to these lots a much lower value than the dry. upland lots, which value will be reflected in the judgment herein.
The westerly side of claimant Keller’s land is contiguous to McCafferty’s lots 4, 5, 6, 7, 8 and 9 in Block D, running north and south, a distance of some 810 feet (claimants’ Exhibit 13). It is some 280 feet wide at the northerly end and some 160 feet wide on its southerly end and the easterly line thereof is about 900 feet in length. Rabbit Hill spreads also across the entire southerly portion of Keller’s land for some 260 feet from south to north.
*796 The Palisades Interstate Parkway runs north and south and parallel to these lands.
It was testified (and it was apparent to the court on its inspection) that the natural drainage in both parcels, prior to the construction of the parkway was generally southerly to and easterly from the northerly base of Rabbit Hill past the present location of the parkway, and then southerly for some additional thousand or more feet to a culvert under Washington Street. Claimants offered testimony that before the parkway construction there was a natural watercourse running from McCafferty’s land through Keller’s and past the parkway to Washington Street. This course was described as five feet wide and one and one-half feet deep, and even deeper east of the parkway. My viewing disclosed a well-defined watercourse east of the parkway, leading out of the culvert. However, on the west side of the parkway, because of the excavating for parkway purposes, plus dumping of fill, added to the impounded water present at the time of the court’s viewing, it was difficult to determine what, if any, watercourse had existed west of the parkway before the construction work. I concluded, however, from the definiteness of the course east of the parkway that there had been such a watercourse west of the parkway before the afore-mentioned construction, extending to the upper level of the surrounding area whence waters flowed by gravity as before described.
The area developed by McCafferty is approximately 1,300 feet long by 400 feet wide. There are some 27 homes thereon besides the 50-foot wide Pine Tree Lane through the center of the built-up area. At point ‘ ‘ 0 ” in claimants ’ Exhibit 12, which is at the southeasterly end of the developed area, Mc-Cafferty established an open pipe which drains the surface waters from the developed area. This water empties into lot 4, Block “ D ”, which is one of those marked “Omit” and which is some three feet lower than the pipe. From point “ 0 ” to the southerly extremity of the entire McCafferty parcel, Pine Tree Lane has been roughed out and is generally higher than the “ Omit” lots on either side of it. Pine Tree Lane itself would prevent any water from backing up from the lots east of it to those west of it. As a matter of fact, the claimant McCafferty agreed through the testimony of its president, that the lots west of Pine Tree Lane were not affected by the water condition on the east side thereof. Therefore, without further consideration, the court dismisses from its determination any claim of appropriation de facto as to lots 2, 3, 4, 5, 6 in Block *797 “ C ”, and as to Pine Tree Lane itself, for they are not affected by the impounded waters.
As to Keller, some 44,200 square feet, or just about one acre, represents Babbit Hill.
"When viewing the property, the court observed that most of the remainder of the Keller property involved in the claim and the remaining lots of McCafferty, namely, 4, 5, 6, 7 and 8 in Block “D” were low lands now mostly covered with water, from a small amount to some one and one-half foot deep. An examination by the court of the soil at the site indicated to the court that for the most part the “ Omit ” lots on McCafferty’s property east of Pine Tree Lane, and Keller’s parcel of 4.5 acres, had been soggy, spongy ground. This observation of the court sustained the testimony of the State witnesses that the soil had been found to be organic peat for some three feet over brown silt and sand.
Even the claimants’ engineer had testified that to make the u Omit ” lots usable for building, four to eight feet of fill would be required. From my observation at the site, I believe it would have required at least that much fill to make Keller’s land usable for building.
The exhibits and my viewing show the land of both claimants to have been thickly wooded which would have required considerable expense to thin out. The shallow roots observed by the court sustained the State’s contention that that was an indication of wet land which did not necessitate the roots going deep into the soil for nourishment. These trees would have been of little value if that part of the land had been developed. The claimants’ tree expert conceded that a four- to eight-feet fill would have killed the trees by stifling the roots.
Babbit Hill, however, was high. It was of no use to Keller because all of Keller’s land nearby was flooded. It would be of some value to McCafferty because he could level it, use the fill and even build upon its level surface. However, for the purpose of this decision, that part of Babbit Hill, east of the projected extension southward of Pine Tree Lane, would be of no use to McCafferty in like manner as it was of no use to Keller.
I have mentioned at length the physical layout so that the. awards to be made herein shall be clearly understood.
In the Summer of 1954, the State began cutting down trees, grubbing and laying aside topsoil along the right of way of the proposed parkway. It is conceded that beginning then, it banked topsoil along the proposed right of way. This banking, like a dam, interfered with the natural flow of drainage *798 toward the east. From 1954, waters from the upland were being slowly impounded and began to back up toward the west. The work continued until, by the Spring of 1955, an embankment 14 feet high had been established and the waters impounded extended more and more to the west over Keller’s land and spread into McCafferty’s afore-mentioned lots. Mr. Tuda, the claimants’ engineer, stated that in May of 1956, three acres of McCafferty’s land and two acres of Keller’s land, were flooded, with 2,000,000 gallons of water in McCafferty’s land and 1,000,000 in Keller’s land. This was not disputed.
The claimants and others affected by the slowly impounding waters, through Mr. Stebbins, their present attorney, complained in 1955 to the Palisades Park Commission. The District Engineer of the Department of Public Works, who supervised the work for the commission, by letter dated October, 1955, replied, to Mr. Stebbins as follows:
“ The Palisades Park Commission and this office are cognizant of the drainage trouble involving your client, William C. Mabie, and others, and while Chief Engineer Nelson of the Park Commission and I have agreed that this drainage should be remedied, an early solution cannot be assured as an adequate remedy promises to be quite complicated and expensive with a requirement of right-of-way acquisition for additional drainage facilities and it is likely that this work cannot be undertaken before next Spring.
‘ ‘ Therefore, it appears that your client will have to be satisfied for the time being with this assurance that plans are going forward to remedy this situation.”
Following this, the State built a culvert under the parkway at a point marked “ A ” in claimants’ Exhibit 13, which is just south of the southerly end of Babbit Hill. This culvert is presumed to take care of all the drainage from claimants’ properties, some adjoining properties and also a section of the parkway surface between points marked “ D ” and “ C ” in claimants’ Exhibit 13. Of course this would also include drainage from the high westerly slopes of the parkway itself.
The court admired the beautiful parkway and is of the opinion that the culvert would be sufficient to carry off the drainage mentioned except for one important item. That item is the fact that on the west side of the parkway the elevation of the ground is 51 feet and the culvert is erected at elevation 51 feet. Sterling W. Theis, Town Superintendent of Highways, testified that the culvert was higher than the impounded waters. My own observation indicates to me that the backing up of drainage *799 waters has been caused by the indifferent erection of this culvert which I find higher than the waters it is designed to receive. Because of this, there is also present silting at the westerly end of the culvert, thus making it so much less operative. It is clear that unless there is a heavy rain this culvert does not function and except for minimal trickles of water passing through, it may as well not be there. The State engineer who testified asserted that the elevation of the surrounding area is 53 feet while the culvert is established at 51.03 feet elevation. The court did not give this assertion much weight because the physical facts I found were as described and because the engineer himself was doubtful of his own figures.
If the lands of the claimants were filled four feet or more (which they are not obligated to do) the culvert might perform with some adequacy. If it were lowered below elevation 51 feet, say to elevation 48 feet or 49 feet, very likely it would perform adequately. As it stands now, however, it does not do that which it was supposed to do, namely, permit the free and natural discharge of the upland drainage, and is not a “remedy [of] this situation” admitted in the letter herein quoted.
The State contends that since McCafferty has canalized the surface drainage in the built-up part of its land (this was done in August, 1957, long after the State commenced to construct the parkway and causing waters to back up) and since Keller orally has permitted McCafferty to discharge said water into his land, they have caused this condition and may not recover. The State goes further and asserts that it had the right to erect the 14-feet embankment for its parkway, which is the natural right of any owner of property, and, since it did not canalize or otherwise artificially interfere with the drainage from claimants’ property, that there was no taking by the State. (Quoting Nichols, Eminent Domain [3d ed.], § 6.1, subd. [1], p. 238; Rockford v. State of New York, 153 Misc. 239, affd. 245 App. Div. 794.) The State is even more emphatic with reference to McCafferty because McCafferty’s land is not even contiguous to the State right of way, as is Keller’s.
The State’s contentions seem to me to be without merit and rather specious. Irrespective of what the claimants did with their drainage (which occurred long after the State impounded the waters), it would have dissipated itself as it did before the parkway was built. The topography of the lands of claimants indicated that even their lower lands were higher than the adjoining lands east of them, part of which adjoining lands *800 was taken for the parkway. Since the Tatter lands were lower they would have continued to take any and all drainage running off both claimants’ lands by the mere operation of gravity.
The damage to the lands of the claimants was the proximate result of the indifferent and inadequate manner in which the State erected the culvert. This caused the backing up of the waters, first in Keller’s and then in McCafferty’s property. The chain of responsibility moves along with the original act. The results are measured by the impact, the same as if one car struck another car in the rear causing it to strike still another in front of it. Both latter cars would have the right to sue for their damage, a right which has accrued to McCafferty in this case. It is true, as the State contends, that damages resulting from a public improvement, effected under legislative authority, are not recoverable in the absence of trespass or negligence, and the burden is upon the claimant to show such trespass or negligence. (Moynehan v. State of New York, 1 N. Y. S. 2d 907; Williams v. State of New York, 106 Misc. 19 and cited cases.) I find, however, that the claimants have proven the State’s negligence herein and are entitled to damages.
The State makes another point for dismissal which must be considered. It quotes the cases of Kossoff v. Rathgeb-Walsh (3 N Y 2d 583) and Bennett v. Cupina (253 N. Y. 436). It contends- that even if it were assumed that there had been a de facto appropriation, that since the State was legislatively authorized to build the parkway and was making reasonable use of its own land, such flooding was therefore damnum absque injuria.
Under the circumstances of these claims, this argument is not tenable. First of all, the State may not perform any act unless it has a basis in a law passed by the Legislature. When the State, pursuant to such legislated act, acquires land, it has the duty as well as the right to use such land reasonably and within the concept of the law permitting such acquisition. It has the right to use such land without causing any unreasonable injury to adjoining lands. It may not just construct a dam under the guise of a necessarily elevated highway and be unconcerned as to what may consequentially happen to one, two or ten nearby owners. Normally, such consequential damages occur to the land adjoining the taking, but there may be instances, as here, where the chain of causation extends to other land not contiguous to the direct taking. This may well be compared to the erection of an impounding dam. The direct taking for the purpose of the dam may be of a relatively small piece of land, *801 but the consequential resulting damage is to an immensely larger number of parcels of land not affected by the dam proper but certainly just as much affected by the receding waters of the dam. This exceeds the doctrine of the respective, rights of two landowners.
In the Kossoff case (3 N Y 2d 583, supra) the court was .concerned with two adjoining lot owners and their relative rights reasonably to improve their property. The question of the relative rights of an upper landowner as against a lower landowner was involved. The court affirmed the common-law rule enunciated in Barkley v. Wilcox (86 N. Y. 140) which holds that owners of upper land or lower land have equal rights to improve and develop their lands by change of grade without incurring liability to the other provided they do not resort to drains, pipes or ditches. At page 588, the court stated: “ Under the common law adopted in this State, either proprietor can improve his land according to his own desire in any manner to which the land is suited, without being liable to the abutting owner for change in the flowage of the surface water provided that he does not resort to drains, pipes or ditches.” And at pages 589 and 590: ‘ ‘ Both have equal rights to improve their properties, come what may to the surface water, provided, of course, that the improvements are made in good faith to fit the property to some rational use to'Which it is adapted, and that the water is not drained into the other property by means of pipes or ditches. Where, as here, it is diffused surface water, neither party is prevented from improving his parcel of land regardless of what becomes of the surface water (Farnham on Waters and Water Rights, Vol. 2, § 187, Vol. 3, § 890; Gould on The Law of Waters, § 267).”
The court held that the facts in Bennett v. Cupina (253 N. Y. 436, supra) are similar to those.in the Barkley case {supra) which is authority for the proposition that there is no liability for the resulting damage.
The court further indicated that the question of good faith is also an element to be considered.
In the claims before me, there is no question of the good faith of the State, much less its right to build the Palisades Interstate Parkway. The court finds that the State acted within its legislated duty to build the parkway. However, its exculpation ends there. The court cannot consider the State in the light only of a lower landowner. The State here artificially created a 14-foot embankment which, because it had of necessity to run north and south, cut athwart the natural drainage of many lands. *802 In addition, its own westerly parkway embankment drained into Keller’s land to which was added the piped surface drainage collected on the surface of the parkway between points “0” and “ D ” on claimants’ Exhibit 13, which scales at 300 feet long by 200 feet wide or an area of 60,000 square feet.
Because of these factors, the State acknowledged by its own acts that the doctrine of the Kossoff case, etc., was not applicable in this situation. The State saw its own responsibility in the above-mentioned letter and when it proceeded to install the culvert. Up to this point the State acted commendably. Having seen fit to install the culvert, it was obliged to construct it in such manner that the culvert would serve its purpose. However, when the State now tries to escape its responsibility for the negligent, ineffective erection of the culvert, by claiming its protection in the doctrine affecting adjoining property owners as enunciated in the eases quoted above, it is calling upon the court to overlook the State’s primary obligation of setting an example of fair play to its very taxpayers and citizens.
I find that the flooded condition is of a permanent nature.
I find that the State has made useless to Keller, 4.5 acres of land owned by Keller, and therefore appropriated the same. I find that the claimant Keller sustained damages, both direct and consequential, in the sum of $4,500, with interest from August 6, 1956 to February 6, 1957, and from June 27, 1957 to the date of entry of judgment.
I find that the State has made useless to McCafferty, and therefore appropriated lots 4, 5, 6, 7, 8 and 9 in Block “D ” of claimants’ Exhibit 12, the subdivision map, which taking is approximately three acres, according to the court’s computation. I find that McCafferty has sustained damages, both direct and consequential, in the sum of $7,500, with interest from March 6,1957 to the date of entry of judgment. On the question of the dates determining the allowance of interest, the court refers itself to the testimony of Stanley B. Huested as being the most reliable.
These damages will be reflected in the findings to be signed herein.
This constitutes the decision of the court in accordance with the provision of section 440 of the Civil Practice Act.
•Let judgments be entered accordingly.