Alexander Del Giorno, J.
The claimant, John B. Belott, has been in the business of mining molding sand in and about Schenectady County for a long time. At the time of the appropriation he had an establishment for storage, processing and shipping molding sand. He had his own hoppers, trucks, railroad siding and laboratory furnished with sandtesting equipment.
He owned lands in fee, and also lands upon which he acquired an easement merely to dig and remove molding sands.
There were two farms involved herein, for which he had entered into agreements giving him exclusive and absolute rights for the years specified in the indentures to dig, process and remove molding sands.
These farms were known by the names of the fee owners; one was the Howard farm, the other was the Tunnard farm. Actually, these were one farm in two ownerships. They were contiguous to each other and about homogeneous in character. In his operations he considered them as one, and when necessary he dumped the finer sand of one upon the coarser sand of the other and mixed them up to produce the finished product he desired.
The so-called Howard farm contained some 92+ acres. The Tunnard farm contained some 20+ acres. This made a total of 112+ acres.
The Howard indenture was executed and recorded on December 5,1941. By it, for the sum of $1,000, Howard gave to Belott the right to dig and dispose of all molding sand for 12 years, with the right to extend this privilege for 2 consecutive 12-year terms, if, meanwhile, he had not mined all the molding sand.
The Tunnard indenture dated June 15,1950, recorded June 16, 1950, for the sum of $250 gave to Belott a like privilege to dig and dispose of all molding sand for a term of 8 years, extending it for 8 years more if all sand had not been dug by the end of the first 8 years.
The two agreements were never abandoned by Belott, although the general demand in the market had been getting lesser, particularly because large concerns were now using synthetic molding sand.
Nevertheless, the court credits Belott’s testimony that by virtue of the length of time remaining on both agreements he would have well used up whatever molding sand remained on the date of appropriation.
*1070 His testimony was that the whole subject property had molding sand and, since no adequate testimony was offered questioning his assertion, the court, like the appraiser for the State, assumes that the area of the appropriation, as well as the whole, had molding sand that was suitable for claimant’s purposes.
Unlike the State appraiser, however, -the court cannot and does not merely set a value per acre taken without consideration of the components of the land. That is an easy method of reaching his results, but it is not the accepted method in the law for determining damages. (Berzal and Co. v. State of New York, 8 AD 2d 886-887). That case holds: ‘‘ The basic factor is always the fair market value of the land as land, whether that factor be applied to the land actually taken or be employed in computation of the difference between the value of the land before the taking and that of any part remaining. It is obvious that market value may often be found to be enhanced by the existence upon the land of soil or other deposits having special or independent value upon severance, but the measure remains the value of the land and not that of its product or component. (See Matter of Huie, 1 A D 2d 500 and cases there cited; Sparkill Realty Corp. v. State of New York, 254 App. Div. 78, affd. 279 N. Y. 656.) ” It is obvious that the valuation of damages found by the State’s appraiser is completely out of line with his own acceptance of the existence of molding sand ip the subject property.
Since all parties, including the State’s appraiser, agree that there was on this land something of more value therein than just inert dirt, he should have considered, as we will consider, to what extent this molding sand enhanced the value of the whole before and after the appropriation, and thus arrived at the damages sustained. This he failed to do and the court can give little weight to this portion of his testimony.
The claimant, on the other hand, has followed this method of evaluation. However, his figures are entirely out of line with the true value of the land and his interests therein. After all} the true barometer of value is what would a willing buyer pay to the claimant, as the willing seller, after ascertaining the diverse views of both sides and making a thorough inspection of the subject property. That, in sum, is what is required of the court as a basis of its determination.
The testimony of the experts was that, according to the formula used in the trade, for each acre dug one foot deep, one would derive 2,000 tons of molding sand.
Belott testified that both boring tests and actual diggings indicated an average depth of some 6 feet of molding sand per acre. However, both my own inspection of the farms and photo *1071 graphs offered in evidence by the claimant lead me to conclude that on the Tunnard farm a depth of 6 feet was correct but, at best, I conclude that the Howard farm has varying depths of 2 to 3 feet, or an average of 2% feet.
The testimony of Belott further indicates that there were left in the Howard farm at the time of the appropriation 11 acres of land containing molding sand and 10 acres in the Tunnard farm. Taking first the Howard farm, we would find that 11 acres of 2% feet average depth times 2,000 tons per acre-foot would indicate a molding sand deposit on the date of appropriation of 55,000 tons; then, the remaining unmined Tunnard deposit of molding sand consisting of 10 acres of 6 feet average times 2,000 tons per acre-foot would indicate a total of 120,000 tons remaining therein.
These acres are the only ones upon which Belott claimed to have mineral deposits left, and to which he had the right to still apply his rights under his indenture at the time of the appropriation and, therefore, the valuations are limited to these.
The claimant and his expert agreed that each ton of sand sold for $3.50 a ton in Summer and $4.50 in Winter; that the ultimate profit was $.30 per ton in Summer and $.50 per ton in Winter. On the basis of those figures the claimant’s expert Petinos said each farm was worth $50,000 and, if considered as one unit, $150,000. Belott himself valued the Tunnard farm at $231,000 and the Howard farm at $242,000, while another expert, Hynes, said the Tunnard farm was worth $230,000 and the Howard farm $237,446.
As to after values, Petinos said 6% acres left of the Howard farm were worth $25,000, Belott said $128,000, and Hynes said $138,600. All considered the Tunnard farm as a complete taking. This assumption by the claimant requires an analysis of the history of the appropriation thereof. The State appropriated therefrom 2.476 acres. The claimant asserts that the State took 8 more acres without filing an appropriation map. The fact is that the road contractor dug and carted away the molding sand which was placed in the road embankment. The claimant himself gave no permission to remove the sand. If wrongly removed, who is responsible to the claimant?
It is elementary that the State cannot be held liable for the tortious actions of an independent contractor employed on a State project. (Schwartz v. Merola Bros. Constr. Corp., 290 N. Y. 145.) If there is an unauthorized trespass on the land of another by a contractor, the State cannot be held liable. (Konner v. State of New York, 227 N. Y. 478.)
*1072 In all cases cited by claimant in Ms memorandum filed with the court, wherein the State or other public authority was held responsible to the owner, it seems that the State was either the actual perpetrator of the trespass or de facto appropriation, or knew that the contractor was appropriating or damaging the land of the claimant, and not only did nothing to stop it but seems to have actively condoned the wrong it knew was committed. (Schumacher v. City of New York, 166 N. Y. 103; Keller v. State of New York, 19 Misc 2d 794; Rosenberg v. State of New York, 24 Misc 2d 960; Clough v. State of New York, 208 Misc. 499; Goldschmid v. Mayor, Aldermen & Commonalty of City of N. Y., 14 App. Div. 135.) The testimony discloses that, as in all cases of roadway contracts, here, too, the State draws the attention of the contractor to the availability, distance and content of borrow pits, and also, where required, the availability of area for dumping excess material which is expected to be dug on the contract job. The fact that any indicated borrow pit may possess valuable mineral ingredients is of no moment to the State, which is unaware of its true content. This would be so particularly in this area where sand of varying degrees of fineness abounds because the entire area is known to contain the alluvial remains of a glacial era lake known as Lake Albany which, it is believed by geologists, covered the earth from Glens Falls to Kingston to a width of a few miles east and west of the Hudson River.
To effectuate a smooth co-ordination of the contract operations, the State offers this type of information to the contractor. Maybe the State should do more. The court believes that the State ought to confer with the owner or other interested party in the “pointed out ” borrow pit, and even determine ahead of the contract if he would consent to sell the content to the contractor. This might avoid many moments of friction in the performance of a road contract between the State and the contractor, and often with the owners. Perhaps in this more enlightened era when public servants are called upon to be more careful of the interests of the smallest among us of our citizens, changes even concerning acquisition of borrow pits may be made. But now we must accept the facts as they are. When the State points out a borrow pit to the contractor, it leaves the matter of digging therein and the cost thereof to the contractor and the owner. It will most often make cross measurements, it is true, but these are made only to determine the total of cubic yards which may be available for the contract work. It is up to the contractor to arrange for the agreement with *1073 the owners and for the payment for the content to be removed and the manner of removal.
The testimony of the claimant himself is that he saw the trucks and equipment of the contractor, Arute Brothers, digging from the 8 acres alleged to have been appropriated de facto. He saw sticks in the ground which the State’s engineers stated were put there for the purpose of defining the extremes of the so-called borrow pit. The State’s witnesses denied any knowledge of or participation by the State in the taking of that sand by Arute Brothers. They assumed the contractor had made his own arrangements with the owner.
The State also tried to prove Belott had lost his rights in the land because of a tax sale of the Tunnard farm to one Messina by tax deed dated August 16, 1957, recorded April 10, 1958.
The court holds that the claimant had not lost his rights pursuant to the tax sale. The indenture between George Tunnard and claimant dated June 15, 1950, for 8 years, and for 8 more if not removed within 8 years, which sells to Belott all marketable molding sand, with the right to enter and remove the same, constitutes an easement in the land in favor of Belott for the period described, which easement is carved out of the fee. (Town of Harrison v. Compagna, 193 Misc. 239, affd. 274 App. Div. 898.)
Such easement, acquired prior to a tax lien, is not subject to a tax sale. A foreclosure of a tax lien or deed from the County Treasurer does not cut off the easement. (Tax Lien Co. v. Schultze, 213 N. Y. 9; Jackson v. Smith, 153 App. Div. 724, affd. 213 N. Y. 630; Harris v. Curtis, 139 App. Div. 393; Wilkinson v. Nassau Shores, 1 Misc 2d 917, affd. 278 App. Div. 970, mod. 304 N. Y. 614; Loening v. Red Spring Land Co., 198 Misc. 151, affd. 277 App. Div. 1050, affd. 302 N. Y. 934.)
The easement cannot be cut off since the ownership of it is apart from the ownership of the land. (Queens Park Gardens v. Long Is. Water Corp., 277 App. Div. 1146, mot. for lv. to app. den. 302 N. Y. 951.)
The market value of the servient estate is lessened to that extent and the assessment of that estate does not include the easement and, therefore, the tax sale of the servient estate does not affect the easement.
The court holds that the claimant’s right to the enjoyment of the easement extended not only for the first 8 years, but also for the next 8 years. As I read the indenture the mere presence of molding sand on the premises at the end of the first 8 years was enough to put into effect the succeeding 8 years; and Tunnard ’a consent would be a mere formality or ministerial act.
*1074 When said Messina bought pursuant to a tax lien sale, he purchased the land subject to the rights of the claimant, as stated above.
Having thus ruled upon the rights of the claimant pursuant to the original indenture with Tunnard, the court holds likewise with regard to the contract affecting the Howard farm.
However, the claimant’s rights to the sand mined from the 8 acres allegedly appropriated de facto, may be asserted only against the contractor for, as far as the records indicate, he was the one who depleted the 8 acres. True, he used it to build part of the State roadway, but he was paid for it by the State in accordance with the requirements of the contract and in pursuance of its terms and conditions. The State would have taken any other fill for the roadway as long as its specifications were met.
The claimant should have acted to stop the contractor, for he saw, as he testified, where this valuable sand was going. Since he had not been served with an appropriation map, he should have inquired of the contractor as to why he was trespassing and digging there out of the evident limits of the contract. Unfortunately, Belott chose to argue with representatives of the State who were not concerned with the manner of progressing the contract but only with matters which were peripheral to such contracts but, nevertheless, necessary to the over-all rights of the State to see that the contract as such was being complied with.
Following upon the above interpretation of the evidence before the court, the award of damages herein will be limited to the land actually appropriated by the State.
In the special category in which we find this claimant, we may consider whatever value he had in the land only in the light in which a willing buyer would approach him. Would such buyer consider sand as it lay in the land, or only as the finished product when ready for the market? The court would reply that such buyer would only consider what he could make in profit in the market, for only that eventuality distinguished the sand in the land from any other kind of land thereabouts. Therefore, it would seem that the profit to be made ultimately would determine the value of the content.
Considering the .Summer and Winter profits testified to, we t.bink $.45 per ton as an average profit would be a fair approach to the valuation per acre of the deposits found by the court to be present on the date of taking; thus, if we take the total of 175,000 tons at $.45 per ton, we arrive at a total of $78,750 as the fair value of the claimant’s interest before the taking. *1075 We assign, from the total found, a fair value of $2,250 per acre in the Howard farm, and $5,400 per acre in the Tunnard farm.
Immediately after the taking there remained 6% acres in the Howard farm which were of the fair and reasonable value of $14,625 and the so-called 8 acres in the Tunnard farm, which were actually 7.525, which were of the fair and reasonable value of $40,635, making the total after value of the claimant’s interest at $55,260.
The court finds that the claimant sustained a direct damage of $23,490.
The court finds that the claimant .sustained no consequential damage since access to the improved Plank Road was available to him.
The court awards judgment to the claimant in the sum of $23,490 with interest thereon from January 12, 1959, the date of the earlier appropriation, to July 12, 1959, and from September 11, 1961 to the date of entry of judgment herein.